Jean P. **LYNCH,** individually and on behalf of all persons similarly situated, Plaintiff,

Jesse M. **Hughes, et al.,** Intervening Plaintiffs-Appellants,

v.

William J. **BAXLEY,** etc., et al., Defendants-Appellees.

No. 82–7346.

United States Court of Appeals, Eleventh Circuit.

Oct. 26, 1984.

Robert D. Segall, E. Terry Brown, Montgomery, Ala., for intervening plaintiffs-appellants.

Julian Butler, Sp. Asst. Atty. Gen., Huntsville, Ala., R. Emmett Poundstone, Asst. Atty. Gen., Dept. of Mental Health, Montgomery, Ala., for defendants-appellees.

Before VANCE and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

CLARK, Circuit Judge:

Plaintiffs-appellants seek to enjoin the defendant officials of the state of Alabama from detaining in county jails persons awaiting mental illness involuntary commitment proceedings.[1] The class alleges that the incarceration provided for in the emergency detention provision of the Alabama civil commitment statute deprives them of due process, constitutes cruel and unusual punishment and denies them equal protection of the laws.

This case marks a continuation of wide-ranging litigation which began in 1974 as an attack on the constitutionality of Alabama's civil commitment procedures. *Lynch v. Baxley*, 386 F.Supp. 378 (M.D. Ala.1974) (*Lynch I*). The class certified in that case contained all persons who were or would be involuntarily civilly committed in Alabama. The three-judge district court found that the commitment statute then in effect violated due process in large part because it allowed detention without a probable cause hearing within a reasonable time, failed to require the presence of the person being committed and appointed counsel at the hearing and contained ill-defined standards for commitment. In response to the judgment of the court, which included an injunction against involuntary commitments under the old system, Alabama enacted a new civil commitment statute in 1975. The new statute provided for a probable cause hearing within 7 days of detention and a final hearing within 30 days of receipt of the commitment petition (§ 22–52–8), the appointment of an attorney (§ 22–52–4) and the presence of that attorney and the person to be committed at all hearings (§ 22–52–9) and established a clear standard for determining whether commitment was appropriate (§ 22–52–10).[2]

In 1977, the class filed a Motion for Further Relief arguing that other provisions of the new statute, those allowing emergency detention in jails until the commitment hearings are held (§§ 22–52–7 and 22–52–8), violated due process, constituted cruel and unusual punishment and deprived them of equal protection.[3] Appellants re-

1. Class plaintiffs appeal the portion of the district court order which denied this injunctive relief. The case before the district court consisted of the motion of the class plaintiffs and one by the defendants to vacate a 1974 injunction thereby allowing state officials to act solely under the Alabama civil commitment statute without court supervision.

2. Alabama moved to vacate the 1974 injunction against it, *see supra* note 1, arguing to the district court that the state had complied with the requirements of the *Lynch* mandate. The district court denied the motion on the grounds that some class member might in the future be able to prove that jail detention amounted to cruel and unusual punishment. The state of Alabama did not appeal the district court's denial of the motion to vacate the 1974 injunction.

3. The provisions sought to be declared unconstitutional in the Motion for Further Relief were (§§ 5, 6, Act. No. 1226) §§ 22–52–7 and 22–52–8.

   **§ 22–52–7. Imposition of limitations upon liberty of person sought to be committed pending hearings; ordering, etc., of examinations of person sought to be committed.**
   (a) At such time as a person sought to be committed is first brought before the probate judge, the probate judge shall determine what

limitations, if any, shall be placed upon such person's liberty pending further hearings. No limitations shall be placed upon such person's liberty unless such limitations are necessary to prevent such person from doing substantial harm to himself or to others or to prevent such person from leaving the jurisdiction of the court. *No such person shall be placed in a jail or other facility for persons accused of or convicted of committing crimes unless such person poses a real and present threat of harm to himself or others and no other facility is available to safely detain such person.*

   (b) The probate judge shall order such person to appear at the times and places set for hearing the petition and may order such person to appear at designated times and places to be examined by medical doctors and mental health professionals. If such person does not appear as ordered by the probate judge, the probate judge may order the sheriff of the county in which such person is located to take such person into custody and compel such person's attendance as ordered by the probate judge. (Acts 1975, No. 1226, § 5.)
   (emphasis added).

   **§ 22–52–8. Holding of probable cause and final hearings generally.**
   (a) If any person sought to be committed has any limitation placed upon his liberty by

tained the same class and class representatives as in the original action. Discovery, which involved sending interrogatories on the terms and conditions of jail detention to all county probate judges, ensued for two years. The district court then dismissed the case without prejudice finding that there was no proof that the named plaintiffs had standing to seek relief from the new statute. On appeal, a panel of this court held that the original plaintiffs no longer had standing.[4] *Lynch v. Baxley,* 651 F.2d 387 (5th Cir. Unit B 1981) (*Lynch II*). Lack of standing by the named plaintiffs, however, was not found to be determinative. The *Lynch II* court found that the class retained a legal status separate from that of the named plaintiffs and that although the class had been truncated by the passage of the new civil commitment statute the claims of those members upon whom the emergency detention provision would operate remained viable. 651 F.2d at 388. The court then remanded the case with instructions to allow time for the intervention of plaintiffs with standing to represent the interests of the class.. *Id.* at 388–89. In response to the district court order complying with the *Lynch II* mandate, counsel for the plaintiffs made a motion to amend the complaint adding David Bruce Pearcy as a party plaintiff in the case. The district court granted that motion and then proceeded to rule against the plaintiffs on their constitutional claims (September 30, 1982). The class then appealed that judgment to this court. During oral argument, a question was raised as to whether this action presented a case or controversy. The amendment to the pleading making Pearcy a class representative indicated that at the time it was filed Pearcy was no longer being held in a county jail but had been committed to a state hospital. Unable to determine whether the named plaintiff had standing to represent the class, this court remanded the case to the district court to make that determination (January 18, 1984). Pursuant to our order, the district court received and considered a stipulation filed by the parties on this question. The stipulation revealed that Pearcy was eventually released from the state mental hospital but was later detained in the Lee County jail pursuant to another petition for commitment under § 22–52–7. Pearcy remained incarcerated at the county jail until his commitment to yet another state facility. The district court considered this evidence and found that Pearcy had standing and therefore was a proper class representative. Since this court retained jurisdiction over this action pending a determination on the standing issue, the case is now before us again. Before considering the claims of the plaintiffs-appellants, however, this court must examine whether the named plaintiff has standing to represent the class.

### Standing

The jurisdiction of federal courts is limited by Article III of the United States Constitution to "cases or controversies." Standing is one aspect of the case or controversy requirement. "The constitutional limits on standing eliminate claims in which the plaintiff has failed to make out a case or controversy between himself

the probate judge pending final hearings on such petition, the probate judge at the time such limitation is placed upon such person's liberty shall set the probable cause hearing within seven days of the date that any limitation is placed upon such person's liberty. If at such probable cause hearing the probate judge finds that probable cause exists that such person should be committed, the probate judge shall enter an order so stating and setting the date, time and place of the final hearing on the merits of such petition.

(b) The final hearing shall be held within 30 days of the date that such person was served with a copy of the petition seeking to commit such person. (Acts 1975, No. 1226, § 6.)

4. The court noted that while Lynch was incarcerated under an involuntary commitment order at the time of the original suit (1974), her current status (1981) was unknown. Hughes, the intervenor in the action, had been subject to commitment proceedings but released. There was no evidence before the court that either plaintiff posed a substantial threat to himself or others and was therefore subject to emergency detention under § 22–52–7.

and the defendant." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66, 76 (1979). Any plaintiff attempting to invoke the power of a federal court must demonstrate a "personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues" and thereby enable the court to resolve constitutional questions. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962). *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 354 (1975). A demonstration of this personal stake is made by the plaintiff's showing that he "has sustained or is immediately in danger of sustaining some direct injury" and that his injury or threat of injury is "real and immediate," not "conjectural" or "hypothetical." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674, 682 (1974). Individual standing requirements must be met by anyone attempting to represent his own interest or those of a class. If the named plaintiff seeking to represent a class fails to establish the requisite case or controversy, he may not seek relief on his behalf or on that of the class.[5] 414 U.S. at 494, 94 S.Ct. at 675, 38 L.Ed.2d at 682. *See also Sosna v. Iowa,* 419 U.S. 393, 402–03, 95 S.Ct. 553, 559, 42 L.Ed.2d 532, 542; 1 Newberg, *Class Actions* § 1072 (1977).

The question before this court is whether Pearcy has a personal stake in this litigation entitling him to seek injunctive relief. In the motion to amend complaint and pleadings submitted in 1981 to add Pearcy as the named plaintiff, it was alleged that at the time of filing Pearcy was hospitalized after having been committed. He had been detained immediately prior to his hospitalization in the Lee County jail pending the involuntary commitment proceedings. Although the pleadings alleged that Pearcy

was at risk of being incarcerated again, there was no evidence to that effect. In the stipulation presented to the district court on remand of this case, there is proof that Pearcy has been incarcerated again pending commitment proceedings. The allegations in both sets of pleadings, however, establish that Pearcy's injury from jail detention was past at the time he was added as a named plaintiff in the case.

■ Past injury from alleged unconstitutional conduct does not in itself show a present case or controversy regarding injunctive relief, if unaccompanied by current adverse effects. *O'Shea v. Littleton,* 414 U.S. at 495–96, 94 S.Ct. at 676, 38 L.Ed.2d at 683. Past wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction. *Id.* The alleged past wrongs in the present case, Pearcy's detention on successive commitment petitions, underscores the likelihood Pearcy will spend more time in jail awaiting commitment hearings.

■ In *O'Shea,* the Court found that the named plaintiffs lacked standing to seek the requested injunction because they did not show the likelihood that the problem exposing them to unconstitutional conduct would persist or that the challenged conduct would continue.[6] There was a notable absence of allegations about the unconstitutionality of the statute on its face or as applied. 414 U.S. at 496–97, 94 S.Ct. at 676, 38 L.Ed.2d at 683–84. Pearcy has, as the district court found, mental problems which require and benefit from the treatment which comes with commitment but which are subject to reoccurrence. There is every indication that the named plaintiff could continue to be the subject of involuntary commitment petitions and thereby sub-

---

5. There was no class determination in *O'Shea* since the complaint was dismissed by the district court on grounds which did not require that determination to be made. 414 U.S. at 494 n. 3, 96 S.Ct. at 675 n. 3, 38 L.Ed.2d at 682 n. 3. What is important to note is that the Court, nevertheless, examined the *standing* of those

purporting to represent a class in its determination of whether there was a case or controversy.

6. The Supreme Court reiterated this position on standing to seek injunctive relief in *Lyons v. Los Angeles,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

ject to emergency detention.[7] Pearcy's mental condition which has prompted two such detentions in the past three years appears persistent. In addition, there is every likelihood that any petition filed against Pearcy would result in his incarceration in the Lee County jail. The class in this case is arguing that the emergency detention provision is unconstitutional because it allows the jailing of those awaiting commitment hearings. The state of Alabama contends that the statute is not unconstitutional on its face or as applied because people are detained in jail only if there is no other facility available. Since mental health facilities are not available in certain counties, it is highly likely that state officials will continue to employ the county jails to detain not only the named plaintiff but also other mentally ill individuals awaiting final commitment hearings. Pearcy has demonstrated that he is realistically threatened by a repetition of his experiences and therefore has standing to seek the requested injunction.

The fact that Pearcy is no longer being detained does not render the case moot. Emergency detention under § 22–52–7 is by the terms of the statute temporary. It is therefore extremely unlikely that any individual could have his constitutional claim decided before he is committed or released. Pearcy has, however, been detained more than once and it is certain that other persons similarly situated will be detained under the statute. The claims of Pearcy and the class are "capable of repetition, yet evading review." *See Sosna v. Iowa, supra,* 419 U.S. at 400, 95 S.Ct. at 558, 42 L.Ed.2d at 541; *Gerstein v. Pugh,* 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 861 n. 11, 43 L.Ed.2d 54, 63 n. 11 (1975).

The emergency detention provision of the Alabama civil commitment statute, § 22–52–7, provides that no one will be placed in jail unless the person poses an immediate threat to himself or others and no other facility is available to safely detain the person. Throughout the state, however, the only facilities found to be routinely available for those people who are not privately placed in mental hospitals pending commitment proceedings are jails. Probate judges have ordered the possibly mentally ill detained in three-fourths of the county jails in the state. In at least six counties people awaiting final hearings have been held past the thirty-day period established in § 22–52–8 for commitment hearings. In at least five counties emergency detainees are not housed separately from accused criminals.[8] Jail detention, according to the plaintiff-appellants' allegations, exacerbates the mental problems of those detained both because of the nature of the jail experience itself and particularly in light of the poor conditions of Alabama county jails. The class has therefore attacked this form of detention, claiming that portions of §§ 22–52–7 and 22–52–8 are unconstitutional on their face and as applied. We will examine and decide the due process, eighth amendment and equal protection claims raised with regard to the provisions separately.

*Substantive and Procedural Due Process*

Involuntary civil commitment has been recognized as a "massive curtailment of liberty." *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394, 402 (1972). As a necessary prologue to involuntary commitment, emergency detention also constitutes a deprivation of liberty which the state cannot accomplish

---

**7.** Pearcy's situation is not like that of the named plaintiffs in *O'Shea* who were alleging that *if* they violated the law and *if* they were charged they would be subject to discriminatory practices. In that case, the Court assumed that if the respondents conducted their activities within the law they would avoid prosecution and exposure to the alleged unconstitutional conduct. 414 U.S. at 497, 94 S.Ct. at 677, 38 L.Ed.2d at 684. Pearcy is at risk of being detained in jail not because of volitional acts on his part but

because his mental condition would prompt his family, as it has done on two previous occasions, to petition for involuntary commitment.

**8.** The district court made no findings of fact regarding the use of county jails for emergency detainees. An examination of the interrogatories submitted by 66 of the 67 probate judges in the state has produced this information.

without due process of law. In order to determine whether a substantive right of the plaintiff-appellants has been violated, it is necessary to balance the liberty of the individual against the demands of an organized society. To determine this balance a court must weigh the interest of the individual against the state's reasons for restraining individual liberty. *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982). The only legitimate justification for the curtailment of liberty involved here pending a commitment hearing is the danger posed by the possibly mentally ill to themselves or others. When it is attempting to protect society from the dangerous mentally ill, the state is using its police power. When it is acting as a parent to care for those incapable of helping themselves, the state is employing its parens patriae power.[9] The district court found that Alabama was properly detaining the class members in jail in order to protect the mentally ill and society. Plaintiff-appellants concede that both justifications for commitment are legitimate and that confinement may be necessary. Emergency detention, however, should not be inconsistent with treating the mentally ill individual or protecting society, to whom plaintiffs belong.

Temporary confinement in jail is particularly harmful to those who are mentally ill. Those detained in jail are surrounded by accused criminals and jailers rather than professionals trained to deal with mental problems. Plaintiff-appellants submitted the undisputed deposition of Dr. Calhoun to show that jail exacerbates the mental problems of the people detained there and thereby lengthens the time it takes to treat them. Discounting this testimony, the dis-

trict court noted that Dr. Calhoun had not seen persons before and after jail confinement as a basis for her opinion that jail confinement was deleterious. The deposition testimony, however, shows that Dr. Calhoun has interviewed many individuals who have been held in jail prior to final commitment, along with those privately placed prior to commitment. On comparison, Dr. Calhoun found that those who had been in jail were more combative, upset and psychotic than those who had been brought to the hospital from home. (Calhoun Dep. at 7). The individuals who have been held in jail are often angry and harder to treat once they reach the mental health facility because they do not understand why they were detained in jail. (Calhoun Dep. at 8). Jail detention can lead to a greater degree of psychosis where it already exists and can possibly create such psychosis where it does not. (Calhoun Dep. at 11–12). According to Dr. Calhoun these problems are caused by using jail as a place for confining these people and that a more therapeutic environment would be preferable. (Calhoun Dep. at ____). The state cannot justify jail detention under its parens patriae power. The state did not offer any evidence on this issue or make any argument that jail detention was not deleterious.

■ Alabama does have a compelling interest in the emergency detention of those who threaten "immediate and serious violence to themselves or others." *Lynch v. Baxley*, 386 F.Supp. 378, 387 (M.D.Ala. 1974).[10] While jail confinement necessarily keeps society safe from these individuals, such detention is not the least restrictive means for achieving that goal. Even if the

9. *See Development in the Law: Civil Commitment of the Mentally Ill*, 87 Harv.L.Rev. 1190, 1207–27 (1974) for a thorough discussion of the theories behind police power and parens patriae commitments.

10. The emergency detention statute relies exclusively on the police power. Section 22–52–7(b) justifies limitations being placed on the individual's liberty only if necessary to prevent the person from doing harm to himself or others or to prevent the person from leaving the jurisdic-

tion of the court. The district court, however, found that the state was using its police power and parens patriae authority in protecting the mentally ill individual as well as society. Considering the fact that jail confinement worsens the mental condition of the detainee, there is doubt as to whether jail detention protects the mentally ill person from harming himself. According to Dr. Calhoun, suicidal tendencies of the mentally ill are increased by jail. (Dep. at 13).

purpose being pursued is legitimate, the government cannot attain it by means that "broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960). *Shelton* formally established the less restrictive means analysis as a consideration in substantive due process cases. The Supreme Court has since applied the analysis to cases involving fundamental rights such as voting and freedom of association.[11] In the context of involuntary civil commitment the Court has not spoken directly to the issue. However, one lower court has explained:

> [T]he principle of the least restrictive alternative consistent with the legitimate purposes of a commitment inheres in the very nature of civil commitment, which entails an extraordinary deprivation of liberty justifiable only when the respondent is "mentally ill to the extent that he is likely to injure himself or other persons if allowed to remain at liberty." A statute sanctioning such a drastic curtailment of the rights of citizens must be narrowly, even grudgingly, construed in order to avoid deprivations of liberty without due process of law.

*Covington v. Harris,* 419 F.2d 617, 623 (D.C.Cir.1969) (footnotes omitted). Other courts have agreed with the application of the least restrictive means analysis to this area. *See O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 2493–94, 45 L.Ed.2d 396, 406 (1975) (civil incarceration unconstitutional where treatment is not necessary and a less restrictive alternative would suffice); *Eubanks v. Clark,* 434 F.Supp. 1022, 1028 (E.D.Pa.1977) (involving transfer rights of the mentally ill to the least restrictive facility consistent with legitimate safety, care and treatment objectives); *Gary v. Louisiana,* 437 F.Supp.

1209 (E.D.La.1976) (required that treatment be accomplished in the least restrictive setting); *Suzuki v. Quisenberry,* 411 F.Supp. 1113, 1132–33 (D.Hawaii 1976) and *Lynch v. Baxley,* 386 F.Supp. 378, 392 (M.D.Ala.1974) (consideration of a less drastic alternative than complete hospitalization for the mentally ill); *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972) (the same), as representative cases.

Emergency detention in jail cannot be considered as the least restrictive means available for Alabama to hold people pending commitment proceedings. By its terms § 22–52–7 clearly states that jail detention is only appropriate where "no other facility is available to safely detain" the mentally ill individual. The district court found that the emergency detainee had to be restrained in the least restrictive method reasonably available to the political subdivision having custody of the subject. If jail is the only county facility which would protect society, it is the least restrictive facility. The district court's finding that jail is the least restrictive means available for restraining these individuals is founded upon the belief that the authority of probate judges is strictly limited. The district court erred in this respect. Section 22–52–7 does not require detention in the county where the proceedings are filed, nor does it require detention in a "public" facility. A county has the option to transport the detainee to a nearby public facility in another county or pay for confinement in a local private facility having quarters for mentally ill patients. Section 22–52–11 provides that the probate court committing any person retains concurrent jurisdiction over that person with the probate judges of the county where he is located as long as the person is in the custody of the mental health department.[12] Since probate judges

---

**11.** The voting case is *Dunn v. Blumstein,* 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274, 284 (1972), which held that if there are other reasonable ways to achieve a state's goals with a lesser burden on the constitutionally protected activity, the state may not choose the means which involves greater interference. The free-

dom of association case is *Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973).

**12.** The complete provision reads as follows:
  **§ 22–52–11. Retention of jurisdiction by probate court over person committed.**
   The probate court committing any person to the custody of the Alabama state depart-

are judges of limited jurisdiction and have not been given statutory jurisdiction *pending* commitment hearings over a person who may be outside the county, the probate judge is, according to the district court, limited to a search for an available facility within his county.[13] Simply because precommitment jurisdiction was not expressly provided for in the statute does not mean that the probate judge lacks such authority. The probate judge has jurisdiction the moment the petition to commit an individual is filed and the individual is taken into custody. Since § 22–52–11 mandates retention of jurisdiction over the committed individual, it stands to reason that the probate court where the petition for commitment originated would have jurisdiction pending a final determination. Since probate judges are not barred from ordering their emergency detainees held outside their respective counties, it becomes clear that jail is not the least restrictive alternative.

■ Due process requires, at a minimum, some rational relation between the nature and duration of confinement and its purpose. *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435, 450 (1972). The district court found that those being temporarily held under commitment petitions were more like pretrial detainees charged with committing a crime. The district court erred in this respect. Such an assessment ignores the fact that pretrial detainees are taken into custody because of their own actions and understand the procedures surrounding their detention. By contrast the mentally ill are apprehended and held because they have mental health problems and other people believe that commitment is necessary.

The analogy between pretrial and emergency detainees also fails to take into account the conditions of Alabama county jails. The district court in *Newman v. Alabama,* 466 F.Supp. 628, 630 (M.D.Ala.1979), found it to be undisputed by the state that the conditions in the county jails are worse than any that exist in the state prisons.[14] Overcrowding is a continuing problem because the state keeps a large number of its prisoners in county jails to ease state prison overcrowding. *Id.* The county jails in almost if not all areas fall below the minimum constitutional standards set forth in *Pugh v. Locke,* 406 F.Supp. 318 (1976).[15] Safety conditions in the jails are substandard. Almost all of the county jails inspected by the State Fire Marshal had serious fire hazards. (Admission 2416.) Of the forty-seven jails with extreme fire hazards, four detained mentally ill persons awaiting hearings for over thirty days. Sixty-seven of seventy jails inspected by the Board of Corrections were found to be unsanitary and in a state of disrepair. (Admission 2414.) Seven of the county jails have been declared unfit to house any human beings. (Admission 2413.) In two of those counties, emergency detainees have been held

ment of mental health or such other public facility as the court may order shall retain jurisdiction over such person concurrently with the probate court of the county in which the person is subsequently located for so long as the person is in the custody of the department of mental health or such other public facility as the court may order, and the probate court committing such person may hold any hearing regarding such person at any place within the state of Alabama where such person may be located. (Acts 1975, No. 1226, p. 2562, § 13; Acts 1977, No. 670, p. 1143.)

13. The district court's interpretation of the reach of the probate court is shared by Alabama probate judges. Evidently the judges order people detained only in county jails or mental health facilities if the families can pay for the

hospitalization. At one time some state mental health facilities were available to house those awaiting commitment hearings. The State Mental Health Department put an end to that practice and decided that no state facilities could be used until after a final commitment order has issued. (Hobbie Dep. at 100–103.)

14. The evidence concerning the conditions of Alabama county jails was stipulated into this record. The information consists primarily of admissions made by the state in discovery relating to the *Newman v. Alabama* statewide prison case and concerns prison conditions as of 1978.

15. The court in *Pugh* found that the conditions of confinement in the state prisons violated the eighth amendment prohibition of cruel and unusual punishment.

for longer than the thirty days provided for in § 22–52–8. At sixty-four of the jails no medical care is routinely provided (Admission 2429.) None of the jails employ trained mental health professionals. Approximately two-thirds of the county jails fail to provide close to sixty square feet of living space per prisoner. (Admission 2410.) Sixty-three of the sixty-seven county jails have no exercise or recreation facilities.

Plaintiff-appellants do not seek freedom from restraint but rather conditions of restraint which do not exacerbate their mental condition. Since emergency detention is justified only until a probable cause determination can be made, those awaiting commitment proceedings are entitled to confinement which is not inconsistent with being released or committed. Jail is a place of incarceration for those accused of crimes. If pretrial detainees cannot be punished because they have not yet been convicted, *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 20 L.Ed.2d 447 (1979), then emergency detainees cannot be subjected to conditions of confinement substantially worse than they would face upon commitment. Temporary jail detention of those awaiting civil commitment proceedings as is currently practiced in Alabama violates substantive due process.

Class members also allege that the routine jailing of emergency detainees results in an abridgment of the procedural due process rights granted them under *Lynch I*. The original mandate in *Lynch I* contemplated emergency detention until a probable cause hearing within seven days and a separate final hearing within thirty days. The delay between the probable cause and final hearings was established to guarantee that the mentally ill person received notice, adequate representation from appointed counsel and time to gather medical evidence on his illness and the least restrictive alternative necessary for treatment. 386 F.Supp. at 389–392. *Lynch I* did not specify what type of facility should be used for emergency detention. Since the enactment of the new Alabama commitment statute, it has become obvious that jail is regarded as the only detention facility available in most counties. Because the probate judges often regard jail as an inappropriate place to hold those subject to commitment proceedings, the probable cause and final hearings are often combined in over half the counties to expedite release from jail. In Montgomery County it is not unusual to have counsel appointed and a combined hearing held on the first day the person is detained. (Hobbie Dep. at 30, 34.) The custom of combining hearings results in a denial of effective assistance of counsel and thereby a chance to present meaningful evidence at the hearings. In Montgomery County there is no psychiatric testimony on the detainee's mental condition in about fifty percent of the cases as opposed to one hundred percent when the person is hospitalized prior to the hearing. (Hobbie Dep. at 42–43.) In those cases there is no testimony with regard to the treatment available for the mental illness or whether commitment is the least restrictive alternative. Testimony on both issues is necessary for the commitment finding by the probate judge.[16]

---

**16.** The findings which are supposed to be made upon committing a person are enumerated in § 22–52–10:

§ **22–52–10. Findings by probate judge; grant or denial of petition for commitment; confinement when treatment for mental illness unavailable.**

(a) If at the final hearing upon a petition seeking to commit a person to the custody of the state department of mental health or such other public facility as the court may order, the probate judge, on the basis of clear, unequivocal and convincing evidence, shall find:

(1) That the person sought to be committed is mentally ill; and

(2) That as a consequence of the mental illness the person poses a real and present threat of substantial harm to himself or to others; and

(3) That the threat of substantial harm has been evidenced by a recent overt act; and

(4) That treatment is available for the person's mental illness or that confinement is necessary to prevent the person from causing substantial harm to himself or to others; and

(5) That commitment is the least restrictive alternative necessary and available for treatment of the person's mental illness;

Where the testimony of mental health professionals is presented regarding detainees, it often comes in the form of a letter. (Hobbie Dep. at 44.)

In some counties combined hearings do not result in an expedited release from jail, but instead a proceeding held past the seven day limit for the probable cause hearing. In those counties the emergency detainees are in effect denied a true probable cause hearing in contravention of *Lynch I* and § 22–52–8.[17] Jail detention of those awaiting involuntary commitment proceedings leads to procedural due process violations.[18]

■ In order to cure the substantive and procedural due process violations found we hold that while a subject is awaiting a probable cause hearing, he must be detained in the nearest state, regional, community, county or private hospital or mental health facility which provides quarters for mentally ill patients. If probable cause is found, then the patient must be detained at one of the foregoing facilities while awaiting the final commitment hearing.

### Eighth Amendment Claim

Plaintiff-appellants claim that temporary incarceration under the desperate conditions found in Alabama jails amounts to cruel and unusual punishment. In *Ingraham v. Wright*, 430 U.S. 651, 669 n. 37, 97 S.Ct. 1401, 1411 n. 37, 51 L.Ed.2d 711, 729 n. 37 (1977), the Supreme Court found that corporal punishment in schools was not covered by the Eighth Amendment but left open the question of whether involuntary civil commitments could raise an Eighth Amendment issue.

Some punishments, though not labeled "criminal" by the State, may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment. *Cf. In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). We have no occasion in this case, for example, to consider whether or under what circumstances persons involuntarily confined in mental or juvenile institutions can claim the protection of the Eighth Amendment. *Id.* "If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions." *Youngberg v. Romero*, 457 U.S. 307, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982). It appears that unsafe conditions for the involuntarily committed, however, implicate due process rather than Eighth Amendment concerns. *Youngberg* analyzed all of the claims regarding unconstitutional conditions as due process claims.

■ In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Court

---

then upon such findings, the probate judge shall enter an order setting forth his findings, granting the petition and ordering the person committed to the custody of the Alabama state department of mental health or to such other public facility as the court may order. (b) If any such element be unproved, the probate judge shall deny the petition and discharge the subject of the petition sine die. (c) If the probate judge finds that no treatment is presently available for the person's mental illness, but that confinement is necessary to prevent the person from causing substantial harm to himself or to others, the order committing the person shall provide that, should treatment for the person's mental illness become available at any time during the period of the person's confinement, such treatment shall be made available to him immediately. (Acts 1975, No. 1226, p. 2562, § 10; Acts 1977, No. 670, p. 1143.)

**17.** The district court made no findings which related to the procedural due process issue.

**18.** Plaintiff-appellants argue that emergency detention violates equal protection for two reasons. First, the state has no compelling or rational reason for treating the subjects of involuntary commitment proceedings worse than convicted felons or those committed to mental hospitals. Second, although class members face the same jail conditions as pretrial detainees, they are denied similar procedural safeguards. Resolution of the substantive and procedural due process claims in favor of the plaintiff-appellants, *see infra*, will eliminate these equal protection problems.

decided that pretrial detainees' complaints about the conditions of their confinement were properly addressed under the Due Process Clause rather than the Eighth Amendment. The proper test for determining whether conditions of pretrial detention violate due process, however, is whether the conditions amount to punishment. 441 U.S. at 536, 99 S.Ct. at 1872, 60 L.Ed.2d at 466. This is because *due process* requires that pretrial detainees not be punished. The convicted criminal may be punished but that punishment may not be cruel and unusual. 441 U.S. at 536 n. 16, 99 S.Ct. at 1872 n. 16, 60 L.Ed.2d at 466 n. 16.

■ In order to determine whether the particular restrictions and conditions arising from pretrial detention amounted to punishment in the constitutional sense, the court looked to factors established in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963).[19] A court must decide whether the restriction is imposed to punish or whether it is simply an incident of legitimate governmental purpose. *Bell v. Wolfish, supra.* 441 U.S. at 538, 99 S.Ct. at 1873, 60 L.Ed.2d at 467. Absent an express intent to punish, that determination will turn on whether the restriction appears excessive in relation to the alternative purpose assigned to it. *Id.* If a restriction is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court may infer that the purpose of the government action is punishment. 441 U.S. at 539, 99 S.Ct. at 1874, 60 L.Ed.2d at 468. We have previously observed that persons awaiting civil commitment are not in the same category as pretrial detainees, because they

have not been charged with a criminal offense. *Supra* at 1460. Conditions affecting pretrial detainees have been viewed in light of the due process clause, not the Eighth Amendment as stated above. Consequently, it follows that the rights of plaintiffs/appellants must be judged under the due process clause. Applying the test in *Bell v. Wolfish*, it appears that conditions imposed upon emergency detainees in Alabama county jails amount to punishment and thereby violate due process. By prohibiting the jail detention of those awaiting involuntary commitment hearings, we have remedied the due process violations.

■ We forbid the use of jails for the purpose of detaining persons awaiting involuntary civil commitment proceedings, finding that to do so violates those persons' substantive and procedural due process rights.

The judgment of the district court is reversed and remanded for entry of judgment in favor of appellants and the class represented.

REVERSED AND REMANDED.

---

**19.** In testing the punitive nature of a particular statute or state practice, the *Kennedy* court found the following factors to be relevant:

> disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned ... 372 U.S. at 168–69, 83 S.Ct. at 567–68. (footnotes omitted.)