# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILLIAM KING,
    *Plaintiff-Appellant*,

v.

COUNTY OF LOS ANGELES;
LEROY D. BACA,
    *Defendants-Appellees*.

No. 14-55320

D.C. No.
2:10-cv-06592-TJH-AGR

OPINION

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, District Judge, Presiding

Argued and Submitted August 30, 2017
Pasadena, California

Filed March 12, 2018

Before: William A. Fletcher and Sandra S. Ikuta, Circuit
Judges, and Sarah Evans Barker,[*] District Judge.

Opinion by Judge W. Fletcher

---

[*] The Honorable Sarah Evans Barker, United States District Judge for the Southern District of Indiana, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's grant of summary judgment in favor of the County of Los Angeles and Sheriff Baca in his official capacity, and affirmed the district court's grant of summary judgment in favor of Sheriff Baca in his individual capacity in an action brought pursuant to 42 U.S.C. § 1983 by a civil detainee alleging that the conditions of his confinement violated substantive due process.

Plaintiff was incarcerated in a Los Angeles County jail for almost eight years as a civil detainee while awaiting the adjudication of an involuntary commitment petition under California's Sexually Violent Predator Act. For more than six of his years in the County jail, plaintiff was confined in Administrative Segregation along with criminal detainees.

Citing *Jones v. Blanas*, 393 F.3d 918, 931–35 (9th Cir. 2004), the panel first noted that under the Due Process Clause of the Fourteenth Amendment, an individual detained under civil process cannot be subjected to conditions that amount to punishment. Under *Jones*, conditions are presumptively punitive if (1) they are similar to those that a pre-trial detainee's criminal counterpart would face, and (2) are more restrictive than conditions faced by individuals following civil commitment. The panel then held that plaintiff's confinement triggered both of the presumptions set forth in *Jones*. As to the first presumption, the panel concluded that

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

sexually violent predator detainees in the Twin Towers Correctional Facility were subject to essentially the same conditions of confinement as their criminal counterparts. As to the second presumption, the panel concluded that conditions in the sexually violent predator unit in the facility were more restrictive than conditions at Coalinga State Hospital. The panel further held that plaintiff's confinement in administrative segregation also triggered both *Jones*' presumptions.

The panel held that on remand, the district court, in evaluating any rebuttal to the *Jones* presumptions, should consider the conditions in the Los Angeles County jails to determine whether, given those conditions and the realities facing the jail administrators, it is possible to rebut the *Jones* presumptions for sexually violent predator detainees held in those jails.

In affirming the district court's summary judgment in favor of Sheriff Baca in his individual capacity, the panel held that the record did not establish that Sheriff Baca supervised the day-to-day operations of the correctional facility, that he was personally involved in any constitutional deprivation plaintiff may have suffered, or the requisite causal connection for liability in his individual capacity.

The panel did not reach the question whether the district court was correct in its application of *Younger v. Harris*, 401 U.S. 37 (1971), for plaintiff's claim for injunctive relief has been mooted by his transfer to Coalinga State Hospital and by his death in the fall of 2017. In light of plaintiff's death during the pendency of this appeal, the panel instructed the clerk of this court to hold the mandate for ninety days, pending a motion for substitution of a personal representative

under Federal Rule of Appellate Procedure 43(a)(1). If no motion for substitution was filed within ninety days, the panel held that this appeal would be subject to dismissal as moot.

## COUNSEL

Ari J. Savitzky (argued), Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Alan Schoenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; for Plaintiff-Appellant.

Rina M. Mathevosian (argued) and Henry Patrick Nelson, Nelson & Fulton, Los Angeles, California, for Defendants-Appellees.

## OPINION

W. FLETCHER, Circuit Judge:

Plaintiff William King was incarcerated in a Los Angeles County jail for almost eight years, from November 2005 to August 2013, as a civil detainee while awaiting the adjudication of an involuntary commitment petition under California's Sexually Violent Predator Act ("SVPA"). The reason for the extensive delay in adjudicating the petition does not appear in the record. For more than six of his years in the county jail, King was confined in Administrative Segregation ("AdSeg") along with criminal detainees. As an SVP detainee, King was compelled to wear a distinctive red uniform that made clear that he had been convicted of a sex crime. As a result, King was attacked in AdSeg by a criminal

inmate who slashed King's cheek, chin, neck, and thigh with a modified razor while shouting, "Die, baby raper, die!"

King brought suit under 42 U.S.C. § 1983, contending that his conditions of confinement violated substantive due process. *See Jones v. Blanas*, 393 F.3d 918, 931–35 (9th Cir. 2004). He appeals a grant of summary judgment in favor of the County of Los Angeles and Sheriff Leroy Baca ("Defendants"). We reverse as to King's claims for damages against the County and against Sheriff Baca in his official capacity. We affirm as to King's claim for damages against Sheriff Baca in his individual capacity. King died during the pendency of this appeal, rendering moot his claim for injunctive relief.

## I. Background

Because this case was resolved at summary judgment, we relate the facts in the light most favorable to King, the non-moving party. *See Holmes v. Cal. Army Nat'l Guard*, 124 F.3d 1126, 1131–32 (9th Cir. 1997). Because King was *pro se*, we consider as evidence all factual statements made in motions and pleadings that were based on his personal knowledge, admissible in evidence, and attested to under penalty of perjury. *Jones*, 393 F.3d at 923.

The SVPA authorizes the civil commitment of "sexually violent predator[s]." *See* Cal. Welf. & Inst. Code §§ 6600.05, 6604. A "sexually violent predator" is a "person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." *Id.* § 6600. Inmates held during

the pendency of SVPA commitment proceedings are civil detainees. *Jones*, 393 F.3d at 922.

In November 2005, a petition was filed to commit King under the SVPA, and a successive petition was filed in 2007. King had previously served sentences for two rape convictions. Pending the resolution of the petition, King was detained at the Twin Towers Correctional Facility ("TTCF"), a Los Angeles County jail. TTCF houses SVP detainees in the jail's SVP unit.

The SVP unit consists of one or more "pods" in a "module," or section, of TTCF. A pod in the SVP unit contains sixteen two-person cells in which detainees sleep, and a communal day room. In the day room are eight metal tables, each with four attached metal stools, and a television. The floor is concrete. The television is encased in a metal and plexiglass box. For a time, the day room contained portable bunks on which several detainees, including King, slept. Finally, each module has a single room with one large window facing outside and covered by a metal-wire mesh screen, for detainees' "outdoor recreation."

Detainees in the SVP unit were housed separately from the jail's criminal population, but were subject to essentially the same regime. Except during the holidays, SVP detainees were locked in their cells at night. SVP detainees were not allowed to make or receive direct telephone calls. They were not allowed to have "contact visits" with anyone, including family members. They were not allowed to possess property such as personal radios, televisions, computers, telephones, and athletic shoes and clothing. They were not allowed direct access to photocopy machines, even if they were representing themselves in legal proceedings.

"As a courtesy," SVP detainees received a few "privileges" that were not available to the criminal detainee population. Jail regulations provided, "Upon availability, and as a courtesy, SVP inmates may be issued one extra blanket." "As a courtesy, SVP inmates may receive hot water servings during [the] AM shift and at the discretion of module staff." "As a courtesy, plastic chairs are permitted in the SVP inmate pod and shall not be assigned to any particular inmate. No more than 10 chairs are permitted in the pod at any given time. Chairs will be permitted after the morning meal and shall be removed from the pod at 2130 hours." "As a courtesy, each SVP inmate may retain a cardboard property box, green property bag and 3 file folders for the storage of legal material." "As a courtesy, daily television programming may be scheduled by SVP inmates." "As a courtesy, SVP inmates are permitted visits seven days a week, but no more than two thirty-minute visits per week." During such visits, "SVP inmates shall be handcuffed to the single-cuff chain attached to the visiting stool."

The precise dates King was housed in the SVP unit are not entirely clear. For purposes of this opinion, we rely on King's "Inmate Information" log maintained by TTCF. According to the log, King was housed in the SVP unit from November 2005 until February 2006, and again from March 2007 to February 2008, for a total of a year and three months.

For the remainder of his time at TTCF, King was confined in AdSeg along with criminal detainees, in conditions indistinguishable from theirs. Detention in AdSeg was highly restrictive. AdSeg inmates were housed in single-person cells and had "their dayroom time alone." Inmates were handcuffed when moved out of their cells. They were not allowed out of their cells for religious services.

According to official jail policy, they were given "a minimum of three hours of [outdoor] exercise and recreation . . . over a period of seven days." According to King, however, he was never let out of his cell for "more than thirty minutes a day to shower and make a brief phone call."

According to his "Inmate Information" log, King spent just over a year in AdSeg, from February 2006 to March 2007. After less than a year back in the SVP unit, he was returned to AdSeg in February 2008, where he remained until August 2013. His total time in AdSeg was about six and a half years.

Defendants claim that King was kept in AdSeg because of his "violent tendencies." During King's time at TTCF, he was involved in several disciplinary incidents, and was eventually designated as a "High Security K-10" status inmate. According to one of the Sheriff's deputies, "[a] K-10 classification is utilized for inmates who, based on confirmed information, require administrative segregation from the general population at all times."

King provides evidence that, if believed, shows that he was improperly given a K-10 classification. Among other things, King asserts that another inmate lied to convince jail staff that King was dangerous and violent, and that jail officials did not follow appropriate procedures to determine the truth of the inmate's charges against King. Taking the facts in the light most favorable to King, there is a genuine issue of material fact as to whether King displayed violent tendencies sufficient to justify assigning him to AdSeg.

King's detention in AdSeg was particularly harsh because of his SVP detainee status. To distinguish types of detainees

and inmates, TTCF required uniforms of different colors. SVP detainees wore red uniforms. Juveniles were the only other inmates who wore red uniforms. King was almost sixty years old in 2006, when he was first placed in AdSeg, which readily distinguished him from juveniles. While in AdSeg, King was threatened repeatedly with death for being a "child molester." Someone taped signs at or next to King's cell, singling him out as a "child molester." One criminal inmate "spent his entire half-hour out-of-cell time exhorting other Ad. Seg. residents to fulfill their [duty] to kill all child molesters." In November 2006, a criminal inmate attacked King with a "makeshift knife" or "altered razor" while screaming, "Die, baby raper, die!" King was cut on his left cheek, chin, neck, and thigh. King repeatedly requested that he be returned to the SVP unit. After his placement in AdSeg in February 2008, his requests to return to the SVP unit were consistently denied.

In April 2012, Defendants attempted to transfer King out of TTCF to Coalinga State Hospital ("Coalinga"), even though his petition had not yet been adjudicated. Coalinga was the designated hospital for persons committed as "sexually violent predators." Cal. Welf. & Inst. Code § 6600.05. For reasons unexplained in the record, after six and a half years of confinement in TTCF, King's civil commitment process still had not been completed. King feared that consenting to the transfer to Coalinga would prejudice his ability to contest his civil commitment, and he therefore informed the Mental Health Court that he wished to stay in TTCF pending the resolution of his petition. In August 2013, King was finally transferred to Coalinga.

To describe the conditions at Coalinga, we take judicial notice of the undisputed and publicly available information

displayed on government websites. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010); *see Department of State Hospitals – Coalinga*, Cal. Dep't of State Hospitals, http://www.dsh.ca.gov/coalinga/ (hereinafter "Coalinga Website"). We do not consider the descriptions offered by King before he was transferred to Coalinga, as he did not have personal knowledge of the facility at the time.

Conditions at Coalinga differ significantly from those at TTCF. SVPs at Coalinga are treated as "patients" by a staff that includes "psychologists, psychiatrists, social workers, rehabilitation therapists, registered nurses, psychiatric technicians, and other medical and clinical staff." Coalinga Website at *Home*. Patients live in dorms, not cells. Coalinga Website at *Facilities*. Patients may make and receive calls using the public telephone in their unit, and the phone numbers for these units are posted online. Coalinga Website at *Family and Friend Resources*, *Visitor Information*. As part of their treatment, patients are encouraged to have visits from friends and family members. Coalinga Website at *Visitor Information*. Patients may hug and kiss their visitors at the beginning and end of each visit, and may hold hands during visits. *Id.* Patients can receive packages from family members and vendors, and can possess "personal items" such as shoes and caps. Coalinga Website at *Family and Friend Resources*, *Statewide Contraband List*.

At Coalinga, opportunities for recreation, education, and religious practice are numerous. Inmates can gather and interact at Coalinga's large socialization courtyard, or the facility's eight smaller social courtyards, visitor's courtyard, or eight landscaped atriums. Coalinga Website at *Facilities*. Indoor sports such as basketball, badminton, and volleyball are available in the gymnasium. *Id.* Outdoor sports are

available in sixteen sports yards and in the baseball "courtyard." *Id.* Religious services are provided in Coalinga's two chapels, sweat lodge, and religious library. *Id.* Weekly services, study groups, and religious counseling are offered. *Id.* Coalinga also has vocational workshops for education, training, and production. *Id.* Coalinga uses its facilities in a treatment program that seeks to cultivate "prosocial behaviors and [the] constructive use of leisure time." Coalinga Website at *Treatment*. As their treatment progresses, "SVPs can petition annually for release, be recommended for outpatient status by [Department of State Hospitals] practitioners, or be determined to no longer meet SVP criteria." Coalinga Website at *Home*.

King remained at Coalinga from August 2013 until his death in the fall of 2017, after we heard argument of this appeal.

## II. Procedural History

On November 23, 2010, King filed a *pro se* complaint against Defendants, alleging that the conditions of his confinement in the SVP unit and in AdSeg violated his right to due process. He sought monetary damages and injunctive relief under 42 U.S.C. § 1983.

The district court dismissed as time barred King's claims based on his detention between November 2005 and January 2006. For the remaining period, the district court granted summary judgment in favor of Defendants. With respect to King's detention in the SVP unit, the district court found that King had not provided admissible evidence of conditions at Coalinga, preventing the court from making the necessary comparisons under *Jones v. Blanas*, 393 F.3d 918 (9th Cir.

2004).  With respect to King's detention in AdSeg, the court found that there was no genuine issue of material fact as to whether there was a legitimate, non-punitive justification for holding King in AdSeg, pointing to his alleged "violent tendencies."  The court rejected King's claims against Sheriff Baca in his individual capacity on the additional ground that King had not established a causal connection between Sheriff Baca's conduct and King's placement in AdSeg.

King appealed.  We initially dismissed King's appeal as untimely, but subsequently vacated the dismissal order.

## III. Standard of Review

We review *de novo* a district court's grant of summary judgment, considering the record in the light most favorable to the non-moving party.  *Jones*, 393 F.3d at 922.  Summary judgment must be reversed if "any rational trier of fact could resolve a material factual issue in favor of the nonmoving party."  *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1202 (9th Cir. 2016).  We also review *de novo* a district court's application of *Younger* abstention. *Gilbertson v. Albright*, 381 F.3d 965, 982 n.19 (9th Cir. 2004) (en banc).

## IV. Discussion

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights." *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000).  To establish a claim under § 1983, King must show the violation of a federal right by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).  To establish liability on the part of the County or Sheriff Baca in his official capacity, King must show that a county policy or custom caused his injury.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91 (1978).

## A. Substantive Due Process

Under the Due Process Clause of the Fourteenth Amendment, "an individual detained under civil process . . . cannot be subjected to conditions that 'amount to punishment.'"  *Jones*, 393 F.3d at 932 (quoting *Bell v. Wolfish*, 441 U.S. 520, 536 (1979)).  We held in *Jones* that individuals who are civilly detained pending commitment proceedings under the SVPA are "entitled to protections at least as great as those afforded to a civilly committed individual[.]" *Id. Jones* established two presumptions: First, conditions of confinement are presumptively punitive if they are "identical to, similar to, or more restrictive than, those in which [a civil pre-trial detainee's] criminal counterparts are held." *Id.*; *see also Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982) (requiring civil detainees be given "more considerate treatment" than criminal detainees).  Second,

conditions of confinement are presumptively punitive if "an individual awaiting SVPA adjudication is detained under conditions more restrictive than those the individual would face following SVPA commitment." *Jones*, 393 F.3d at 933. If either presumption applies, the burden shifts to the defendant to show (1) "legitimate, non-punitive interests justifying the conditions of [the detainee's] confinement" and (2) "that the restrictions imposed . . . [are] not 'excessive' in relation to these interests." *Id.* at 935.

### 1. The *Jones* Presumptions

We hold that King's confinement in the SVP unit triggers both of the *Jones* presumptions. As to the first presumption, comparing the conditions of confinement in the SVP unit "to . . . those in which [the SVP detainees'] criminal counterparts [we]re held" in TTCF, we conclude that conditions were "similar." *Id.* at 932. The only difference between the conditions of confinement for SVP detainees and their criminal counterparts was that SVP detainees were provided specified "privileges," not as a right but "as a courtesy": an extra blanket "upon availability"; "hot water servings" at the discretion of staff; "no more than" ten plastic chairs in the day room during the day; "a cardboard box, a green property bag and 3 file folders"; the ability to schedule television programming; and no-contact thirty-minute visits twice a week while chained to a metal stool. These "privileges" did not change the basic nature of the SVP detainees' incarceration in TTCF. The reality was that SVP detainees in TTCF were subject to essentially the same conditions of confinement as their criminal counterparts. They were confined to their pod; they were not allowed outside and were exposed to fresh air only through a screened window; and

they were given minimal opportunity for recreation and exercise.

As to the second presumption, comparing the conditions of confinement for those "awaiting SVPA adjudication" to those "following SVPA commitment," we conclude that conditions in the SVP unit in TTCF were "more restrictive" than conditions at Coalinga. *Id.* at 933. The comparison between the two facilities is so stark that we need not belabor the point.

We hold, further, that King's confinement in AdSeg also triggers both presumptions. As to the first presumption, the conditions in AdSeg to which King was subjected were "substantially more restrictive" than even the conditions faced by the jail's general criminal population. *Id.* at 934. For King, they were especially harsh, as he was required to wear a red uniform, signaling that he was an SVP detainee and therefore, in the view of some of the criminal detainees, a child molester or rapist. As a direct result, King was viciously attacked while in AdSeg. As to the second presumption, the conditions in AdSeg were vastly different from the conditions at Coalinga.

### 2. Legitimate, Non-Punitive Justifications

The *Jones* presumptions can be rebutted by showing "legitimate, non-punitive government interests," and by showing that restrictions are not "excessive in relation to those interests." *Id. at* 932, 935. Such interests "include ensuring a detainee's presence at trial, maintaining jail security, and effective management of a detention facility." *Id.* at 932. A defendant must "identify the specific penological interests involved and then demonstrate both that

those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests." *See Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1990). Even if legitimate, non-punitive interests are identified, conditions of confinement may still be "excessive" if they are "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Jones*, 393 F.3d at 934 (quoting *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1484 (9th Cir. 1993)). King has asked us to remand to the district court to require Defendants to offer such rebuttal.

In evaluating any rebuttal to the *Jones* presumptions on remand, the district court should consider the conditions in the Los Angeles County jails to determine whether, given those conditions and the realities facing the jail administrators, it is possible to rebut the *Jones* presumptions for SVP detainees held in those jails. *Compare Lynch v. Baxley*, 744 F.2d 1452, 1458, 1462 (11th Cir. 1984) (holding that in light of the harsh conditions in Alabama's jails, and given that even "[t]emporary confinement in jail is particularly harmful to those who are mentally ill," individuals awaiting civil commitment proceedings must "be detained in the nearest state, regional, community, county or private hospital or mental health facility which provides quarters for mentally ill patients"). The district court should also take into consideration the extended period during which King was held in TTCF. It is one thing to confine an SVP detainee in a county jail for a few months while awaiting adjudication of a civil commitment petition. For such brief periods, it may be justifiable to hold him in an SVP unit and to subject him to many of the jail's rules and policies. Further, if during that period he commits a serious disciplinary infraction, it may be permissible to confine him

for a limited time in AdSeg, as long as appropriate procedural protections are provided before such confinement. However, it is quite another thing to confine an SVP detainee for an extended period in a county jail's SVP unit or AdSeg. In this case, King was confined as a civil detainee in TTCF for almost eight years—in the SVP unit for a year and three months, and in AdSeg for six and a half years.

## B. Liability of the County and Sheriff Baca in His Official Capacity

A county is subject to Section 1983 liability "if its policies, whether set by the government's lawmakers or by those whose edicts or acts . . . may fairly be said to represent official policy, caused the particular constitutional violation at issue." *Streit v. County of Los Angeles*, 236 F.3d 552, 559 (9th Cir. 2001) (internal quotation marks omitted). The Los Angeles County Sheriff, "when functioning as the administrator of the local jail, is a County actor." *Id.* at 565. Thus, Sheriff Baca may be held liable in his official capacity for the policies and practices of the county jails under his administrative control. *Cortez v. County of Los Angeles*, 294 F.3d 1186, 1190–92 (9th Cir. 2002).

The conditions of King's confinement were governed by two Unit Orders issued by the Sheriff's Department. First, Unit Order 5-17-310 established TTCF's SVP unit policy, extending generally applicable jail restrictions to inmates in the SVP unit and authorizing certain "courtesy" privileges. Second, Unit Order 5-17-011 established TTCF's AdSeg policy, including criteria for holding inmates in AdSeg and restrictions on AdSeg inmates. These policies "guided, or at least governed" the actions of TTCF officials in their treatment of King. *Id.* at 1190. As a result, the County and

Sheriff Baca in his official capacity may be held liable in damages for any aspect of King's detention that violated the Due Process Clause.

## C. Liability of Sheriff Baca in His Individual Capacity

A county official sued in his individual capacity may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). "The requisite causal connection [for liability in a defendant's individual capacity] can be established . . . by [the defendant] setting in motion a series of acts by others, or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207–08 (quoting *Dubner v. City & Cty. of S.F.*, 266 F.3d 959, 968 (9th Cir. 2001)) (internal citation and quotation marks omitted). The record in this case does not establish that Sheriff Baca supervised the day-to-day operations of TTCF, that he was personally involved in any constitutional deprivation King may have suffered, or the requisite causal connection for liability in his individual capacity.

## D. *Younger* Abstention

Defendants argue that we should abstain under *Younger v. Harris*, 401 U.S. 37 (1971). *Younger* established a "strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary

circumstances." *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982). This policy applies to criminal judicial proceedings and civil judicial proceedings that implicate important state interests. *Id.* at 432.

The district court applied *Younger* abstention to deny relief only "[t]o the extent [King] seeks removal from Ad-Seg." We do not reach the question whether the district court was correct in this application of *Younger*, for King's claim for injunctive relief has been mooted by his transfer to Coalinga in August 2013, and by his death in the fall of 2017. For the remaining claims for damages, the most that *Younger* could possibly require is a stay pending the completion of the state proceedings, *see Gilbertson*, 381 F.3d at 968, but there are no pending state proceedings.

## E.  Substitution of Parties

In light of King's death during the pendency of this appeal, we instruct the clerk of this court to hold the mandate for ninety days, pending a motion for substitution of a personal representative under Federal Rule of Appellate Procedure 43(a)(1). If no motion for substitution is filed within ninety days, this appeal is subject to dismissal as moot.

## Conclusion

Involuntary civil commitment is a "massive curtailment of liberty" that requires the protections of due process. *United States v. Budell*, 187 F.3d 1137, 1141 (9th Cir. 1999) (quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972)). We reverse the district court's grant of summary judgment in favor of the County and Sheriff Baca in his official capacity,

and affirm the district court's grant in favor of Sheriff Baca in his individual capacity. We remand for further proceedings.

**REVERSED in part, AFFIRMED in part, and REMANDED.**