[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14669
_____

D.C. Docket No. 2:10-cv-03314-AKK


J W,
by and through his next friend, Tammy Williams,
G S,
by and through her next friend, LaTonya Stearnes,
P S,
by and through her next friend, LaTonya Stearnes,
T L P,
by and through her next friend, Tarra Pritchett,
T A P,
by and through her next friend, Barbara Pettaway, individually, et al.,

Plaintiffs-Appellees,

versus

BIRMINGHAM BOARD OF EDUCATION, et al.,

Defendants,

A. C. ROPER,
in his individual and official capacity as Chief of the
Birmingham Police Department,
J. NEVITT, Officer,
in his individual capacity,
A. CLARK,
Officer, in his individual capacity,
R. TARRANT,

Officer, in his individual capacity,
M. BENSON,
Officer, in her individual capacity,
D. HENDERSON,
Officer, in his individual capacity,
S. SMITH,
Officer, in his individual capacity,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

(September 24, 2018)

Before ED CARNES, Chief Judge, JORDAN, Circuit Judge, and LAMBERTH,[*]
District Judge.

PER CURIAM:

Student Resource Officers employed by the Birmingham Police Department

and stationed at schools have the authority to use Freeze +P, an incapacitating

chemical spray, on students under certain circumstances. A number of

Birmingham high school students who were sprayed with or exposed to Freeze +P

in 2009, 2010, and 2011 filed a civil rights lawsuit under 42 U.S.C. § 1983 against

the Birmingham Board of Education; A.C. Roper, the Chief of the BPD; and the

SROs who used the spray against them or in their vicinity. Asserting individual

_____

[*] Honorable Royce C. Lamberth, United States District Judge for the District of
Columbia, sitting by designation.

2

and class-based claims, they alleged that the SROs used excessive force in violation of the Fourth Amendment by spraying them and by failing to adequately decontaminate them.  They also claimed that the constitutional violations were the result of a policy or custom of the Birmingham Police Department.  They requested damages as well as declaratory and injunctive relief.

Following a 12-day bench trial, the district court issued a comprehensive 120-page order on September 30, 2015, with detailed findings of fact and conclusions of law.  *See J.W. v. Birmingham Bd. of Educ.*, 143 F. Supp. 3d 1118 (N.D. Ala. 2015).  As summarized below, the district court granted the students relief on most of their claims.

With respect to the individual claims, the district court found in favor of two students, K.B. and B.J., on their excessive force allegations against the SROs who sprayed them with Freeze +P, and awarded each of them $5,000 in damages.  Because those rulings have not been appealed, we do not discuss or address the use of Freeze +P on any of the students except to discuss the availability of class-based declaratory and injunctive relief.

The district court also found in favor of six students—G.S., B.D., T.L.P., T.A.P., K.B., and B.J.—and against the SROs who failed to adequately decontaminate them after the use of Freeze +P, and awarded each of them $5,000 in damages.  The SROs found liable on the decontamination claims now appeal,

arguing that they are entitled to qualified immunity on the students' Fourth Amendment claims.

On the class claims, the district court concluded that the Fourth Amendment violations occurred pursuant to a policy or custom of the BPD, and ruled that declaratory and injunctive relief was warranted. Rather than issue a permanent injunction, however, the court ordered the parties to meet and confer to devise a training and procedure plan to improve the policies related to the use of chemical spray in Birmingham schools. In so doing, the court set out a number of "general practices" (which we detail later) to guide the parties in their formulation of the plan. The parties complied with the court's order and submitted a proposed plan (with some disagreements) in December of 2015. As of today, the court has not entered a final judgment or permanent injunction.

Chief Roper appeals the rulings on the class claims. He contends that these claims should have been dismissed for lack of standing, that they alternatively fail on the merits, that the district court should have decertified the class, and that the court's mandatory injunction (the "general practices" provided to the parties for the formulation of the proposed training and procedure plan) is contrary to the principles of federal-state comity.

It has taken us a long time following oral argument to go through the record in this complex case, including the lengthy trial transcript and documentary

4

evidence, to evaluate and analyze the parties' competing arguments.  Having completed our review, we commend the district court for its thorough work and analysis in this difficult case.  We conclude that the September 30 order is final and appealable under 28 U.S.C. § 1291 pursuant to our decision in *United States v. Alabama*, 828 F.2d 1532, 1536 (11th Cir. 1987), *superseded by statute on other grounds as recognized by Lussier v. Dugger*, 904 F.2d 661, 664 (11th Cir. 1990); that assuming the SROs in question violated the Fourth Amendment by failing to adequately decontaminate the students exposed to Freeze +P, they are entitled to qualified immunity because the relevant law was not clearly established at the time of their conduct in 2009, 2010, and 2011; that the class-based claim for declaratory and injunctive relief with respect to the use of Freeze +P fails for lack of standing; and that the class-based claim for declaratory and injunctive relief with respect to the decontamination policy also fails for lack of standing.

## I.     APPELLATE JURISDICTION

The district court ruled on September 30, 2015, that the plaintiffs, as a class, were entitled to injunctive relief on their spraying and decontamination claims. But it declined to issue an injunction at that time, and directed the parties to "meet and confer, engage in fruitful discussions and compromise, and develop and jointly submit" a single training and procedure plan with respect to the use of pepper spray.  *See* D.E. 282 at 118.  On the issue of spraying, the court stated that the plan

5

had to "address the current deficiencies and form a template for [SROs'] use of Freeze +P going forward." *Id.* at 118–19.  The court also provided a number of "general practices" to guide the parties in their drafting of the decontamination aspect of the plan:

> (1) unless doing so would endanger the student, officer, or bystanders, after an [SRO] sprays a student with Freeze +P and has secured the student, the officer must provide the student with an opportunity to decontaminate with water, either in the form of a shower, washing at a sink, or using an eye wash station; (2) because of the lingering exposure from contaminated clothing, at all times, Chief Roper must maintain at each school where the B.P.D. allows [SROs] to spray students with Freeze +P a sufficient number (as agreed by the parties) of sweat suits in varying sizes, and must allow the student to change out of his or her contaminated clothes; (3) the [SRO] must then place the student in front of a fan; (4) Chief Roper must ensure that [SROs] have available sealable plastic and/or garbage bags that an affected student can use to store her contaminated clothing; and (5) Chief Roper must replace each sweat suit a student uses so that the total number available at the start of each week is always the same as the initial number agreed on by the parties.

*Id.* at 119–20.  Finally, "because of Freeze +P's impact on nearby students and to generally educate students about its effects," the court also directed the parties to "jointly draft," by the same date, "a one-page flyer that is to be posted prominently on each high school's central bulletin boards or to be disseminated electronically to each enrolled student that, among other things, outlines the effects of Freeze +P and the suggested methods to use to obtain relief in the event a student is exposed to Freeze +P." *Id.* at 119–20.

6

The court indicated that it would issue an order and judgment after November 15, 2015. *Id.* at 120. The court later extended the deadline to December 15, 2015, which is when the parties submitted their joint plan. *See* D.E. 295; D.E. 309. The court has not entered a final judgment or issued an injunction. And, as far as we can tell, the record does not show that the parties have drafted or posted the flyer ordered by the district court.

Given the lack of a final judgment or permanent injunction, the first question we confront is jurisdictional. Is the district court's order of September 30, 2015, appealable as a "final" order under 28 U.S.C. § 1291, or as an injunction under 28 U.S.C. § 1292(a)(1)? Exercising plenary review, *see, e.g., Williams v. Chatman*, 510 F.3d 1290, 1293 (11th Cir. 2007), we conclude that the September 30 order is final under § 1291, and as a result we need not address whether it is also appealable as an injunction under § 1292(a)(1).

Generally speaking, an order must be "final" to be appealable. *See* 28 U.S.C. § 1291; *see also Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83 (1981) ("The first Judiciary Act . . . established the general principle that only *final* decisions of the federal district courts would be reviewable on appeal."). An order, however, does not have to be the last one issued for it to be final under § 1291. *See Alabama*, 828 F.2d at 1536. Because finality is "frequently so close a question that decision of that issue either way can be supported with equally forceful

7

arguments," *Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 152 (1964), we disdain a formalistic test and employ a pragmatic approach, which is "essential to the achievement of the 'just, speedy, and inexpensive determination of every action,'" *Alabama*, 828 F.2d at 1537 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 306 (1962)).

A district court order in a § 1983 case requiring one or more of the parties to submit a remedial plan, without more, is not final. *See id.* at 1538. But such an order is immediately appealable when it "contains other injunctive relief" or "when the content of the plan to be submitted has already been substantially prescribed by the district court." *Id.* (holding that a district court order requiring the submission of a remedial desegregation plan was final under § 1291 because it "substantially prescribed" the requirements of the plan—the order resolved every issue, gave detailed instructions, and "le[ft] [the] defendants with little flexibility" in drafting the plan); *accord Groseclose v. Dutton*, 788 F.2d 356, 358–61 (6th Cir. 1986); *Spates v. Manson*, 619 F.2d 204, 209 (2d Cir. 1980).

The September 30 order "substantially prescribed" the requirements of the training and procedure plan the parties were directed to jointly submit, and is therefore appealable under § 1291. In its order, the district court made detailed factual findings about the challenged conduct, concluded that the constitutional rights of certain students had been violated, and specified the amount of damages

8

that those students were entitled to.  The court also ruled that class-based injunctive relief was warranted as to the students' spraying and decontamination claims.  Although it declined to issue permanent injunctive relief, the court ordered the parties to meet, confer, and submit a proposed training and procedure plan that would remedy the constitutional problems identified in its order.  Significantly, the court listed a series of "general practices" (quoted earlier) to guide the parties in formulating the decontamination aspect of the plan.  For example, the SROs have to provide each student they spray "with an opportunity to decontaminate with water, either in the form of a shower, washing at a sink, or using an eye wash station."  D.E. 282 at 119.  Chief Roper, for his part, has to provide sufficient sweat suits at each high school for students who are exposed to Freeze +P, and must ensure that the SROs "have available sealable plastic and/or garbage bags that an affected student can use to store her contaminated clothing."  *Id*.  And, as noted above, the parties are also required to create a one-page flyer for students that explains the effects of Freeze +P and details how to obtain relief after exposure.  *Id*. at 120.

On balance, we are satisfied that the September 30 order, in practical terms, is final under our precedent.  *See Alabama*, 828 F.3d at 1537–38; *Morales v. Turman*, 535 F.2d 864, 867 n.6 (5th Cir. 1976), *rev'd on other grounds*, 430 U.S. 322 (1977).  We therefore turn to the merits.

9

## II.    QUALIFIED IMMUNITY

We first take up the qualified immunity appeal of the SROs who were held individually liable on the decontamination claims.  *See, e.g., Vaughan v. Cox*, 343 F.3d 1323, 1333 (11th Cir. 2003) (explaining that a defendant can assert "a qualified immunity defense at trial"); *Alexander v. Fulton County*, 207 F.3d 1303, 1320 (11th Cir. 2000) (reviewing denial of qualified immunity after trial), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc).  As noted earlier, the district court found in favor of six of the students on their decontamination claims and awarded them $5,000 each in damages.  The court ruled that certain SROs violated the clearly established Fourth Amendment rights of these students by failing to adequately decontaminate them after spraying them with Freeze +P.  *See* D.E. 282 at 65 n.54, 76.  We review *de novo* the court's qualified immunity ruling.  *Harris v. Bd. of Educ.*, 105 F.3d 591, 595 (11th Cir. 1997).

To provide context for the district court's rulings, and for the parties' arguments, we set out the evidence presented at trial concerning Freeze +P and decontamination.  We then return to the court's specific findings concerning the SROs and the six students.

10

A.     Trial Evidence About Freeze +P and BPD's Decontamination Procedures

Freeze +P is a chemical designed to temporarily incapacitate a person by causing pain and intense tissue irritation (burning of the eyes, skin, mouth, and airway, tearing, reflexive closing of the eyes, coughing, gagging, and difficulty breathing).  According to one of the defense experts, Freeze +P works because it results in "severe pain."  D.E. 282 at 31.

The material safety data sheet for Freeze +P describes emergency and first aid procedures for exposure to the spray as follows:

> EYES: Flush eyes with large quantities of water to speed recovery. Face subject into wind or forced air source such as fans or air conditioning outlet.  Wash face with mild soap.

> SKIN CONTACT: Remove contaminated clothing.  Wash affected area with soap and water to avoid transfer to more sensitive areas. Burning sensation with skin contact in most areas.  Use no creams or salves.  Persons with preexisting skin disorders may be more susceptible to the effects of this agent.

> INHALATION: Irritant, stimulation of facial nerves causes feeling of restricted airway.  No danger exists for asphyxiation. Remove persons to fresh air.

> INGESTION: Severe burning heartburn sensation may cause nausea.  Seek medical attention if nausea persists.

D.E. 282 at 37.

Training materials from Aerko International, the manufacturer of Freeze +P, say the following about proper treatment for those exposed to the spray:

While there are no medical practitioners on the staff of Aerko International, the following regimen is suggested based on documents of the United States Chemical Warfare Service and our experience overseeing hundreds of exposures, both intentional during training or accidental as a result of production mishaps.

A wash may be prepared utilizing approximately 100 to 120 grams of sodium bisulfate in four gallons of cool water. Subjects experience some relief when splashing this solution on [a]ffected areas.

When running water is available, a softly flowing stream from a hose should be applied to the face and eyes. Copious amount[s] of cool water will give some relief.

After initial treatment with water or wash, the subject should be moved to fresh air and faced into the wind. The time to recovery is directly proportionate to the speed of the air stream. Fans or air conditioning outlets provide an excellent source of relief. In the event running water or the [s]odium [b]isulfate solution is not available[,] excellent field treatment results may be obtained by placing the subject in the front section of a vehicle and directing the air conditioning vent into his face.

D.E. 282 at 37–38.

In 2006, prior to the incidents in question, the BPD published rules and regulations concerning what police officers (including SROs) should do after they use a chemical spray like Freeze +P. These rules and regulations explain, in relevant part, that chemical spray "is primarily an inflammatory agent" which causes the "[i]nvoluntary closing of the eyes," the "[s]welling of the mucous membranes, which results in shallow breathing ability," and "[i]ntense burning on sensitive parts of the body." Plaintiff's Ex. 3 at 3 (Birmingham Police Department,

12

Chemical Spray Subject Restraint:  Non-Deadly Use of Force, Revision 5 (Feb. 10, 2006)).  According to the rules and regulations, the "effects of chemical spray will begin to lessen in 10–15 minutes with all effects disappearing in approximately 45 minutes, with no treatment being administered." *Id.*  SROs and other police officers are instructed that following the use of chemical spray, "the officer will ensure that the subject receives adequate decontamination as soon as practical.  The officer should supply immediate medical attention if requested by the subject." *Id.*  In addition, "Birmingham Fire and Rescue will be called and will determine whether or not the subject needs further medical attention or hospital treatment." *Id.* at 4.

BPD training materials state that the effects of chemical spray "are temporary," that eyes can open in 10–20 minutes after treatment with "[c]ool air or water," that respiratory effects diminish in 10–30 minutes, and that effects on the skin may persist for 45–60 minutes and "up to hours" for some "sensitive subjects."  D.E. 282 at 32.  Chief Roper explained that SROs and other BPD officers are required to undertake "adequate" decontamination efforts—which can be water, time, and/or air—and to notify Birmingham Fire and Rescue.  *See id.* at 38.  One of the defense experts, however, testified that if he were sprayed with a chemical, his "first choice method of decontamination would be to wash with copious amounts of water and soap, and if neither were available, he would want

13

access to a fan." *Id.* at 39. That same expert also opined that SROs should provide students who are intentionally sprayed with water to decontaminate as soon as the situation is safe. *Id.* One of the high school principals testified that in the school setting it would not be difficult for an SRO to take a student exposed to chemical spray to a location like a chemistry lab to wash or flush his or her face. *See id.* at 74.

The district court found that all BPD officers are trained on the Department's rules and regulations at the police academy and receive periodic retraining in various forms. *See id.* at 25. The court also found that training for cadets at the police academy includes "describing the chemical components of Freeze +P, reviewing the Chemical Policy, spraying the cadets with Freeze +P in an outdoor environment, and answering cadet questions. Cadets are instructed to wash their faces with warm, soapy water 30 minutes to an hour after exposure." *Id.* at 30. "Although cadets are personally instructed to use warm soapy water for their own exposure, [they] are trained that the appropriate methods for decontaminating an individual sprayed with Freeze +P are time, air, and calling Birmingham Fire and Rescue." *Id.*

### B.    The District Court's Qualified Immunity Ruling

The district court, citing Fourteenth Amendment decontamination cases such as *Danley v. Allen*, 540 F.3d 1298, 1304 (11th Cir. 2008), *overruled on other*

14

*grounds as recognized by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010), based its Fourth Amendment ruling on several subsidiary conclusions: (1) an officer's failure to decontaminate a person after subjecting him or her to chemical spray, absent extenuating circumstances or lack of feasibility, is a violation of the Fourth Amendment; (2) students who are sprayed with chemical spray should receive access to copious amounts of water and soap; and (3) time and/or air alone are inadequate decontamination measures. *See id.* at 73–75.

The district court considered the SROs' decontamination efforts wholly inadequate as to the six students sprayed and found that in most cases the officers "did absolutely nothing other than call Birmingham Fire and Rescue." *See id.* at 71. The SROs, the court found, did not give the students access to any airflow and/or give them an opportunity to wash their faces or shower, and did not provide them with clothes that were not contaminated with Freeze +P. *See id.* at 9 (SRO Anthony Clark/G.S.), 11 (SRO Jeremiah Nevitt/T.L.P.), 14 (SRO Douglas Henderson/B.D.), 17 (SRO Silburn Smith/K.B.), 20–21 (SRO Marion Benson/B.J.), and 23 (SRO Ricky Tarrant/T.A.P.). Even when the SRO in question tried to provide some assistance to the student—such as in the cases of B.D. and T.A.P.—the court found those efforts to be constitutionally insufficient. *See id.* at 72.

15

C.    Qualified Immunity Analysis

In actions brought under 42 U.S.C. § 1983, the doctrine of qualified immunity offers complete protection for government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citations and internal quotation marks omitted). To be entitled to qualified immunity, an official must first show that he was acting within his discretionary authority when the allegedly wrongful acts occurred. *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006). Once the defendant makes that initial showing, the burden shifts to the plaintiff to demonstrate that qualified immunity should not be granted. *See id*. The plaintiff must show (1) that the defendant violated one of his constitutional rights, and (2) that the right was clearly established at the time of the wrongful conduct. *See Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015).

There is no dispute in this case that the SROs were acting in their discretionary authority in the moments following their deployment of Freeze +P. So the question is whether the district court properly denied qualified immunity to the SROs for failing to adequately decontaminate the six students who were awarded damages. For the reasons that follow, we conclude that the district court erred in denying the SROs qualified immunity.

16

The SROs argue that the students improperly asserted their decontamination claims under the Fourth Amendment. As the SROs see it, the students should have proceeded under the Fourteenth Amendment because they were arrestees and/or pre-trial detainees after they were sprayed. *See* Appellants' Br. at 31–32. The students respond that the Fourth Amendment provides the correct framework to analyze their excessive force claims because the inadequate decontamination occurred during the process of arrest, "moments after the seizure began[,] . . . prior to any formal booking, and before pretrial detention began." Appellees' Br. at 23.

Generally, the Fourth Amendment protects against the use of excessive force during investigatory stops and arrests, while the Fourteenth Amendment guards against the use of excessive force against arrestees and pretrial detainees. *See, e.g., Graham v. Connor*, 490 U.S. 386, 387 (1989); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996). Although the Supreme Court has held that "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment," *Graham*, 490 U.S. at 395, neither we nor the Supreme Court has decided whether the Fourth Amendment continues to provide individuals with protection from excessive force beyond the point at which an arrest ends and pretrial detention begins, let alone in the school context, *see id.* at 395 n.10; *Wright v. Whiddon*, 951 F.2d 297, 300 (11th Cir. 1992); *see also Kinglsey v. Hendrickson*,

17

135 S. Ct. 2466, 2479 (2015) (Alito, J., dissenting) ("[W]e should decide whether a pretrial detainee can bring a Fourth Amendment claim based on the use of excessive force . . . .").

We need not decide whether the Fourth Amendment or the Fourteenth Amendment governs the students' decontamination claims to resolve the SROs' qualified immunity arguments. Assuming that those claims are properly brought under the Fourth Amendment, and that the SROs violated the Fourth Amendment by not adequately decontaminating the students, the relevant law was not clearly established at the time of the SROs' conduct. *See Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011) ("[I]f the law was not clearly established, we need not decide if the Defendants actually violated the Plaintiffs' rights[.]").

To determine whether a right is clearly established, we ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (recognizing that "fair and clear notice" is the cornerstone of the qualified immunity analysis). There are various ways to evaluate whether a right is clearly established. *See id.* at 1350–53. First, the plaintiff can point to a materially similar case decided at the time of the relevant conduct by the Supreme Court, the Eleventh Circuit, or the relevant state supreme court. The first method looks at the relevant case law at the time of the alleged violation that would have made it

18

obvious to the officer that his actions violated federal law. *See Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017). The prior case law need not be directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S. Ct. at 551 (citations and internal quotation marks omitted). Second, the plaintiff can identify a broader, clearly established principle that should govern the novel facts of the situation. *See Gaines*, 871 F.3d at 1208. Third, the plaintiff can show that the conduct at issue so obviously violated the Constitution that prior case law is unnecessary. *See id.* The plaintiff must establish that the conduct "lies so obviously at the core of what the alleged constitutional amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer, notwithstanding the lack of fact-specific case law." *See Fils*, 647 F.3d at 1291. This third method, often referred to as the "obvious clarity" scenario, is a "narrow exception" to the "normal rule that only case law and specific factual scenarios can clearly establish a violation." *Id.*

The students argue that they had a Fourth Amendment right to be adequately decontaminated after they were sprayed with Freeze +P and that this right was clearly established at the time of the SROs' conduct in 2009, 2010, and 2011. *See, e.g.,* Appellees' Br. at 46 (referring to the "right to be free from the excessive force of [an officer's] fail[ure] to decontaminate"). But the Supreme Court has told us "not to define clearly established law at a high level of generality" because the

"dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citations and internal quotation marks omitted). As a result, the "inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. Such specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (citations and internal quotation marks omitted).

The question for us, therefore, is whether the "state of the law" in 2009, 2010, and 2011 "gave the [SROs] fair warning that their . . . treatment of [the students]" as to decontamination "was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The students rely on our 2008 decision in *Danley* to argue that their right to adequate decontamination was clearly established.[1]

Mr. Danley was a pre-trial detainee who was arrested for driving under the influence and taken to jail, where he was ultimately pepper sprayed for failing to

---

[1] The students also cite to an unpublished Fourteenth Amendment case, *Nasseri v. City of Athens*, 373 F. App'x 15 (11th Cir. 2010)—where qualified immunity was denied to officers who kept a pretrial detainee confined to a poorly-ventilated space after he was pepper sprayed—to bolster their qualified immunity argument. *See* Appellees' Br. at 46–47. Unpublished cases, however, do not serve as binding precedent, *see* 11th Cir. R. 36-2, and cannot be relied upon to define clearly established law, *see Gilmore v. Hodges*, 738 F.3d 266, 277 (11th Cir. 2013) ("[W]e look only to binding precedent—holdings of cases drawn from the United States Supreme Court, this Court, or the highest court of the state where the events took place.").

20

comply with certain commands. *See* 540 F.3d at 1303. He alleged in his complaint that, after spraying him, the officers placed him in a small, poorly-ventilated cell, prevented him from washing off the pepper spray for approximately 20 minutes, mocked him as he begged for help, and then gave him insufficient time to shower. *See id.* at 1304. He also alleged that he was ultimately put in a group cell, where other detainees complained that their eyes were burning due to the residue on him. *See id.* After suffering for 12–13 hours, he was released and able to see a doctor for treatment. *See id.* at 1305.

We held in *Danley* that the district court correctly denied the officers' motion to dismiss the complaint on qualified immunity grounds because Mr. Danley had alleged sufficient facts to make out a violation of his Fourteenth Amendment right to be free from cruel and unusual punishment. Using a multi-factor test to apply the "shocks the conscience" standard, we concluded that once Mr. Danley was disabled due to the pepper spray, "the use of force in the form of extended confinement in the small, poorly ventilated pepper spray-filled cell, when there were other readily available alternatives, was excessive." *Id.* at 1308–09. We also concluded that Mr. Danley had sufficiently alleged that the officers acted maliciously and sadistically for the purpose of causing harm. According to the complaint, the officers mocked Mr. Danley while he was suffering from the effects of the pepper spray and did not give him enough time to shower (they gave him

21

two minutes when the jail policy dictated that the shower should be fifteen minutes). *See id.* at 1309–10.

As relevant here, we also held in *Danley* that the district court properly denied the officers' motion to dismiss Mr. Danley's Eighth Amendment claim for deliberate indifference to his serious medical needs. *Id.* at 1310–13. Mr. Danley was not merely suing based on the immediate effects of pepper spray, and had sufficiently alleged that he suffered chemical conjunctivitis and bronchospasms due to the effects of prolonged exposure to pepper spray without adequate decontamination (e.g., the delay in allowing him a shower and the inadequate length of the shower). *Id.* at 1310. We said, in part, that "[if] a shower is the only treatment that is required, then an adequate shower is required." *Id.* at 1311. And we concluded that the officers were not entitled to qualified immunity for the Eighth Amendment deliberate indifference claim: "This is a case in which general legal principles announced by our decisions in this area of law are enough to make the right violated clearly established. . . . Danley alleged both a serious medical need and the jailers' deliberate indifference to it." *Id.* at 1313.

*Danley* certainly holds that, under certain circumstances in a prison setting, an officer violates the Fourteenth Amendment if he does not timely and adequately decontaminate (or provide timely and adequate decontamination services to) a prisoner who is suffering from the prolonged effects of an incapacitating chemical

22

spray.  For a couple of reasons, however, we do not believe that *Danley* provided fair and clear notice to the SROs that their decontamination efforts (or lack thereof) violated the students' Fourth Amendment rights.

The first reason is legal in nature.  *Danley* did not set out the minimum decontamination procedures that the Constitution requires an officer to pursue or provide for all persons in custody (including those in a school setting) after the use of chemical spray.  Although the "ultimate touchstone of the Fourth Amendment is reasonableness," *Kentucky v. King*, 563 U.S. 452, 459 (2011) (citation and internal quotation marks omitted), the students here, beyond alleging that the SROs' decontamination efforts were constitutionally lacking, have not attempted to explain why the additional steps that they want taken are a Fourth Amendment requirement, *see* Appellees' Br. at 46 (referring only to the "right to be free from the excessive force of [an officer's] fail[ure] to decontaminate").  And, as we explain below, the record developed at trial shows that the paramedics who examined the students chose not to administer any treatment and in two cases told the students not to wash with water.

The second reason why *Danley* does not provide adequate notice is more factual than legal.  The students here, after being sprayed with Freeze +P, felt like their faces, eyes, and noses were burning, and they experienced trouble breathing.  *See, e.g.,* D.E. 282 at 31–32.  But, as the students recognize, *see* Appellees' Br. at

23

43, what happened to Mr. Danley is more severe than what they experienced after being subjected to Freeze +P, and the conduct of the SROs here is different than what the officers in *Danley* were alleged to have done.  On this record, those differences matter for purposes of qualified immunity.  *See, e.g.*, *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008) ("For a right to be 'clearly established,' previous case law must have developed it in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law.").

Starting with SRO Nevitt and T.L.P., the Freeze +P hit T.L.P. in the mouth and caused her to cough, but did not affect her eyes, her nose, or her breathing.  SRO Nevitt took T.L.P. to the assistant principal's office, which had air conditioning, and called the paramedics.  At the office T.L.P. was not in pain, *see* D.E. 304 at 161, and when they arrived, the paramedics asked her a few questions but did not provide any treatment.  SRO Nevitt then transported T.L.P. to family court.  Given the limited impact of Freeze +P on T.L.P., her lack of pain at the office, and the paramedics' decision not to provide treatment, SRO Nevitt would not have been placed on notice by *Danley* that his conduct violated the Fourth Amendment.

As for the remaining SROs, we agree with the district court that they did not give the students an opportunity to wash or shower—as indicated (or at the very

24

least suggested) by Aerko International's safety data sheet and as permitted by the BPD's rules and regulations—and did not provide them with clothes that were uncontaminated. And, like the district court, we are troubled by the fact that some of these SROs (SRO Smith/K.B., SRO Henderson/B.D., SRO Benson/B.J.) drove the students away from school with the windows of their police cars rolled up, thereby denying them an additional source of air which could have helped speed up the decontamination process.

Nevertheless, we conclude that SROs Clark, Henderson, Smith, Benson and Tarrant are entitled to qualified immunity. First, as we understand the record, the students were exposed to fresh air or air conditioning in an office or in the school building after the spraying. *See* D.E. 282 at 8 & D.E. 296 at 148 (G.S.); D.E. 282 at 13 (B.D.); D.E. 296 at 110 (K.B.); D.E. 298 at 184 (T.A.P.); D.E. 282 at 20 (B.J.). Second, the students were seen shortly afterwards by paramedics. In each and every case, these independent medical professionals who evaluated the students chose not to provide them with any treatment. *See* D.E. 282 at 8 (G.S.), 13 (B.D.), 16 (K.B.), 22 (T.A.P.); D.E. 305 at 156 (B.J.). Indeed, in a couple of cases, the paramedics told the students that putting water on their faces would make their burning symptoms worse. *See* D.E. 282 at 8 (G.S.), 16–17 (K.B.). On this record, the SROs were entitled to rely, at least in part, on the independent medical judgment of the paramedics, and their failure to use all of the

25

decontamination options listed in Aerko International's materials and/or in the BPD's training materials did not make any Fourth Amendment violation apparent. *Cf. Taylor v. Threadgill*, 221 F.3d 1254, 1259 (11th Cir. 2000) (explaining, in a Fourteenth Amendment case involving the alleged denial of medical care to a pretrial detainee, that "failure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence").

The district court, we think, understandably determined that the SROs did not engage in best practices, and that they could have done more for the students in their decontamination efforts. But assuming that their failure to go further violated the Fourth Amendment, the rights of the students to be decontaminated to the degree demanded were not clearly established under the circumstances presented.

Alternatively, the students argue that the SROs' conduct was "so far beyond the hazy border between excessive and acceptable force" that they had to have known that they were violating the Constitution even in the absence of "fact-specific case law." *Vinyard*, 311 F.3d at 1355 & n.18. Although we empathize with the students, two of whom vomited after being sprayed with Freeze +P, we are not persuaded by their argument.

The students' complaint is that the SROs did not do enough to decontaminate them. Again, we agree with them, and with the district court, that the SROs did not do all that they could have done. They did not, for example,

26

provide the students with access to water to wash or shower. But it is not fair to characterize the SROs' conduct as the complete failure to take any decontamination action at all. The SROs provided the students with some fresh air or air conditioning following the use of Freeze +P, and the students were seen by paramedics who chose not to administer treatment (and who on two occasions told the students not to put water on their faces). For purposes of qualified immunity, it is not insignificant that the methods used by the SROs—passage of time, exposure to fresh air, and evaluation by paramedics—were at least partially consistent with their training and, at least to some degree, with the instructions provided by Aerko International, the manufacturer of Freeze +P. Again, assuming that the SROs fell short of the Fourth Amendment minimum, they were not faced with an "obvious clarity" scenario.

Recognizing that cases from other lower federal courts cannot create clearly established law for qualified immunity purposes, we note, as well, that the other chemical spray cases we have found—mostly in the prisoner/denial of medical care context—have arisen in different factual scenarios and do not set out definitive or minimum constitutional standards for the decontamination of those who suffer from exposure. So, even if we could look outside the Eleventh Circuit and the Alabama Supreme Court, the published case law would not have provided the SROs with "obvious clarity" about the purported unconstitutionality of their

27

conduct. *See, e.g.*, *Iko v. Shreve*, 535 F.3d 225, 241–43 (4th Cir. 2008); *Clement v. Gomez*, 298 F.3d 898, 904–06 (9th Cir. 2002).

## III.    CLASS-BASED CLAIMS

As relevant here, K.B. asserted two claims for injunctive relief under § 1983 against Chief Roper, in his official capacity, on behalf of herself and a class of "all current [and] future high school students" of Birmingham schools. *See* D.E. 188 at 4, 56–59. The first class claim was that Chief Roper violated the Fourth Amendment rights of K.B. and the class by promulgating unconstitutional use-of-spray and decontamination policies. *See id.* at 56–57; D.E. 246 at 7–8. The second class claim was that Chief Roper failed to train and monitor the SROs' use of chemical spray. *See* D.E. 188 at 58–59. The class was certified before trial, *see* D.E. 187, and after trial the district court ruled that the class was entitled to injunctive relief, *see* D.E. 282 at 118–20.

The district court concluded that Chief Roper's actions rendered the City of Birmingham liable on both aspects of the policy/custom claim, but not as to the failure-to-train claim. *See id.* at 98–109. As to the failure-to-train claim, the court rejected the use-of-spray portion and concluded that the decontamination portion

28

was subsumed by K.B.'s policy/custom claim because the SROs were trained pursuant to an unconstitutional policy. *See id.* at 109–13.[2]

Several facts, according to the district court, supported standing for the class claims:  school attendance was mandatory; the SROs acted pursuant to BPD policy; and the SROs subjected the students to the spray for engaging in "a variety of normal adolescent behavior." *See id.* at 93.  The court, guided by our decisions in *Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir. 1994), and *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003), rejected Chief Roper's argument that *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), precluded injunctive relief. *See, e.g.*, D.E. 282 at 113–16.

Chief Roper argues that the district court should have dismissed the class policy/custom claims for lack of standing.  Exercising plenary review, *see, e.g., Ga. Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1257 (11th Cir. 2012), and for the reasons that follow, we agree as to the spraying claim and the decontamination claim.[3]

---

[2] The students have not appealed the adverse ruling on the failure-to-train claim.

[3] The district court concluded that under cases like *City of St. Louis v. Praprotnik*, 485 U.S. 112, 113 (1988), Chief Roper was the final policy maker of the BPD for municipal liability purposes.  *See* D.E. 282 at 94.  Because that ruling is not challenged on appeal, we do not address it further.

29

### A.    Article III Standing Requirements

Article III standing is a prerequisite to a federal court's exercise of subject-matter jurisdiction.  *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014).  To have standing, a plaintiff must show that he suffered an injury, that there is a sufficient causal connection between the injury and the conduct complained of, and that there is a likelihood that the injury will be redressed by a favorable legal decision.  *See id.*  Because standing "is not dispensed in gross," a "plaintiff must demonstrate standing for each claim and for each form of relief that is sought."  *Town of Chester, N.Y. v. Laroe Estates*, 137 S. Ct. 1645, 1650 (2017) (citations and internal quotation marks omitted).

"A party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury."  *Church*, 30 F.3d at 1337.  Past wrongs serve as evidence of whether there is a real and immediate threat of future injury, but "past exposure to illegal conduct does not demonstrate a present case or controversy if unaccompanied by any continuing, present adverse effects."  *Id.* (quoting *Lyons*, 461 U.S. at 102).

Whether a future injury is likely to occur in part depends on whether the misconduct alleged is authorized by or part of a government policy.  *See, e.g., 31 Foster Children*, 329 F.3d at 1266.  When alleged misconduct is "authorized or

30

part of a policy, it is significantly more likely that the injury will occur again." *Id*. On the other hand, if future injury is based on the occurrence of a random or unauthorized act, then the injury is "too speculative" for standing purposes. *Id*.

In assessing whether a future injury is likely to occur, we consider whether the plaintiff is likely to have another encounter with a government officer due to the same conduct that caused the past injury. *See, e.g., Honig v. Doe*, 484 U.S. 305, 320 (1988). "We generally have been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury." *Id*. at 319. This hesitation, however, does not apply in circumstances where the plaintiff is unable to control or prevent the behavior that prompted the alleged misconduct. *See id*. at 320 ("It is respondent Smith's very inability to conform his conduct to socially acceptable norms that renders him 'handicapped' within the meaning of the EHA."). In those situations, it is reasonable to expect that the individual will engage in the misconduct. *See id*.

We have explained that "[i]ndividual standing requirements must be met by anyone attempting to represent [her] own interest or those of a class." *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984). That means K.B. must establish standing to proceed with her claim for class-based relief, even though she is no longer a student at a high school in Birmingham. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991) (considering whether the named plaintiffs

31

had standing based on the allegations in their complaint, even though their claims

had since been rendered moot by the time of their appeal).[4]

### B.    Standing for the Spraying Claim

For a number of reasons, we conclude that K.B. did not have standing to

seek declaratory and injunctive relief on her use-of-spray claim.  K.B. did not

demonstrate that there was a real and immediate threat that she would be subjected

to excessive force by the SROs because of the BPD's use-of-spray policy.  We

discuss *Lyons* and then turn to the evidence before the district court.

In *Lyons*, Los Angeles police had employed a chokehold on Lyons even

though he did not resist the initial stop.  *See* 461 U.S. at 97–98.  Lyons alleged that

the City of Los Angeles routinely authorized and encouraged this method of

control, and sought, in addition to damages, injunctive relief barring the use of

chokeholds except in situations where the subject reasonably appeared to threaten

the use of deadly force.  His complaint alleged that at least ten chokehold-related

deaths had occurred, and by the time the case reached the Supreme Court there had

---

[4] As the district court correctly explained, *see* D.E. 282 at 81–82, the fact that K.B. is no longer a student does not mean that the class-based claims for injunctive relief disappear.  K.B. was a student at the time suit was filed, and at the time the class was certified.  That her own claims for injunctive relief have become moot does not doom the claims of the class.  *See, e.g., McLaughlin*, 500 U.S. at 51 ("It is true, of course, that the claims of the named plaintiffs have since been rendered moot[.] . . . Our cases leave no doubt, however, that by obtaining class certification plaintiffs preserved the merits of the controversy for our review."); *Sosna v. Iowa*, 419 U.S. 393, 401 (1975) ("Although the controversy is no longer alive as to appellant Sosna, it remains very much alive for the class of persons she has been certified to represent.").

been another five such deaths. The district court granted Lyons a preliminary injunction preventing the Los Angeles police from using chokeholds under circumstances in which there was a threat of death or serious bodily injury. *See id.* at 95–100.

Citing a number of its prior decisions, the Supreme Court reversed the district court's preliminary injunction and held that Lyons "failed to demonstrate a case or controversy with the City that would justify the equitable relief sought." *Id.* at 105. The Supreme Court explained: "In order to establish an actual controversy . . . Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter . . . or, (2) that the City ordered or authorized police officers to act in such a manner." *Id.* at 105–06.

Although Lyons asserted that he may be subject to a chokehold again, the Supreme Court rejected the notion that the "odds" that he would be stopped again for a traffic infraction, and also subjected to a chokehold without provocation, sufficed to "make out a federal case for equitable relief": "[I]t may be that among the countless encounters between the police and the citizens of a great city like Los Angeles, there will be certain instances in which strangleholds will be illegally applied and injury and death unconstitutionally inflicted on the victim. As we have

33

said, however, it is no more than conjecture to suggest that in every instance of a traffic stop, arrest, or other encounter . . . the police will act unconstitutionally and inflict injury without provocation or legal excuse." *Id.* at 108. Because nothing in the policy of the Los Angeles police "suggest[ed] that . . . chokeholds . . . are authorized absent some resistance or other provocation by the arrestee or other suspect," the Supreme Court concluded that Lyons had not established a "real and immediate threat" that he would be stopped and choked again. *Id.* at 105, 110.

Chemical spray can be properly deployed under the Fourth Amendment when the subject uses or threatens force, physically resists, or attempts to flee. *See, e.g., Vinyard*, 311 F.3d at 1348 ("Pepper spray is generally of limited intrusiveness and it is designed to disable a suspect without causing permanent physical injury.") (citation and internal quotation marks omitted). It cannot, of course, be used indiscriminately or without cause on students (or for that matter, on anyone else), *see, e.g., Brown v. City of Huntsville*, 608 F.3d 724, 738–39 (11th Cir. 2010) (officer violated Fourth Amendment by using pepper spray on driver whose offense was playing music too loudly and was not threatening or attempting to flee), but its use is not always unconstitutional in the school setting, *cf. Gray*, 458 F.3d at 1307 ("Every reasonable officer would have known that handcuffing a compliant nine-year-old child for purely punitive purposes is unreasonable."). Indeed, the district court ruled that the use of Freeze +P against some of the

34

students did not constitute excessive force.  *See* D.E. 282 at 55 (B.D.), 56 (T.A.P. and T.L.P.).

At the time of the events in question in this case, the BPD's policies provided that SROs could use chemical spray as a means of control when a subject demonstrated defensive resistance (a Level IV category of resistance), such as pulling away or pushing away; engaged in active aggression (a Level V category of resistance), such as challenging, punching, kicking, and grabbing; or used lethal force (a Level VI category of resistance), which included the use of firearms, knives, or any force that the officer believes could cause serious bodily injury or death.  *See id.* at 26 (Revision 9 to BPD's Use of Force Policy, Procedure No. 113– 3).  And Chief Roper testified that at that earlier time SROs had the discretion to use chemical spray for lesser behavior, such as passive resistance (a Level III category of resistance), which includes dead weight; and verbal non-compliance (a Level II category of resistance), which includes blank stares, clenching of fists, and tightening of jaws.  *See id.* at 26–27.

By the time of trial, however, the BPD had revised its policies concerning the use of control mechanisms.  Significantly, the revised policy, which became effective in 2012, required SROs to consider a number of specific factors when determining the appropriate amount of control for a given situation, including the seriousness of the crime committed by the subject; the subject's size, age, and

weight; the apparent physical ability of the subject; the number of subjects present; the weapons possessed or available to the subject; the subject's known history of violence; the presence of innocent or potential victims; and the possible destruction of evidence. *See id.* at 27–28 (summarizing Revision 10 to BPD, Use of Force Rules and Regulations, No. 113–3); *see also id.* at 29 ("[C]hemical spray may be used in an arrest situation where the weapon's use offers the possibility of lessening the likelihood of physical injury to the arresting officer, citizens on the scene, and/or the suspect.") (quoting BPD, Chemical Spray Subject Restraint: Non-Deadly Use of Force, Revision 5 (Feb. 10, 2006)).

The request for declaratory and injunctive relief has to be assessed in light of the revised BPD policies that were in place at the time of trial, *see Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1549 n.8 (11th Cir. 1989), and those policies— which permit the use of chemical spray across a broad range of scenarios—are not facially unconstitutional. For example, to the extent they permit the use of Freeze +P on subjects who are trying to use force or weapons against an officer (or others), the policies conform to the Fourth Amendment. *See generally Brown*, 608 F.3d at 738–39 (surveying Eleventh Circuit cases on the use of chemical spray).

K.B., therefore, could not establish standing for injunctive relief merely by showing that SROs will use Freeze +P on students in Birmingham schools pursuant to the BPD's policies. She had to show a sufficient likelihood (a "real

36

and immediate threat" in the words of *Lyons*) that the SROs would use Freeze +P

on her in an unconstitutional way due to or because of the BPD's policies. *See*

*Church*, 30 F.3d at 1337 (explaining the Supreme Court's reasoning in *Lyons*). We

conclude that she did not meet her burden.

The circumstances here, we think, are very much like those in *Kerr*, a case

involving plaintiffs who had been seriously injured when bitten by police dogs in

the course of their arrests by West Palm Beach police officers. We affirmed the

district court's denial of declaratory and injunctive relief under *Lyons* because the

police department's use of canines was not facially unconstitutional and

"encompassed a broad range of action." *Kerr*, 875 F.2d at 1553. Although that

policy might "*permit* unconstitutional seizures in some circumstances, [it] d[id] not

*require* its officers to act unconstitutionally." *Id.* at 1554. "[S]uch general

policies," we said, "are not unconstitutional on their face; [the plaintiffs] therefore

have no standing to seek injunctive or declaratory relief against the policy's

continued usage." *Id.*

The district court here found a pattern of incidents in which SROs used

pepper spray in response to students who did not pose an immediate threat, *see*

D.E. 282 at 101, and pointed to 11 examples of students who were sprayed solely

for verbal noncompliance, *see id.* at 99–100, 115, but the evidence at trial

demonstrated that SROs generally considered on a continuum the level of control

37

they could impose based on the circumstances presented and factors indicating that a more dangerous situation was developing. *See* D.E. 299 at 160; D.E. 304 at 173, 178; D.E. 305 at 57–58. This evidence was in line with the policies in place at the time of the incidents and was more clearly emphasized in the policy revisions that came later and were in place at the time of trial. *See* Pl. Ex. 1 at 3 (recognizing that, depending on the "dynamics of a situation," varying degrees of control are justified); Pl. Ex. 2 at 11 (stating that "each officer/citizen confrontation should flow in a logical and legal consequence of cause and effect").

Under *Lyons* "there is no per se rule denying standing to prevent probabilistic injuries," *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1162 (11th Cir. 2008), but here the likelihood of future constitutional injury from spraying is too speculative. At trial, there was no evidence that many Birmingham students who were disciplined by SROs would be sprayed with Freeze +P. Nor did the evidence show that many such uses of Freeze +P would be unconstitutional. The evidence, in fact, demonstrated that the use of chemical spray in Birmingham high schools had been infrequent. At the time of trial the eight high schools in Birmingham served approximately 7,000 to 8,000 students a year, and there were a total of only 16 SROs stationed in all eight high schools. *See* D.E. 298 at 160–61; D.E. 299 at 186; D.E. 303 at 221. The use-of-force reports and other evidence indicated that from 2006 to 2014 SROs used chemical

38

spray approximately 110 times, impacting roughly 199 students, out of an estimated total of 70,676 students enrolled during that eight-year timespan. *See* D.E. 282 at 31; DE 298 at 160–61. So during that eight-year period the spray was deployed an average of only 1.7 times a year at each school. One of the students' experts testified that a Birmingham student has a 0.4%, or 4 out of a 1000, chance of being intentionally sprayed. *See* D.E. 298 at 160–61.[5]

Allegations of intentional chemical spraying that also constitutes excessive force were even more rare. In the eight years from 2006 to 2014, there were only 16 complaints alleging that spraying had constituted excessive force because it was an improper use of Freeze +P. *See* D.E. 83-5 at 9. The record is silent about exactly how many of those actually involved—instead of only were claimed to involve—the improper use of Freeze +P. If we use as a barometer the 11 times that SROs sprayed students with Freeze +P solely for verbal non-compliance, *see* D.E. 282 at 115, then out of the 70,676 students there is only a .016%, or 1.6 out of 10,000, chance of being unconstitutionally sprayed. And the probability of being unconstitutionally sprayed may even be smaller than that. Of the six instances that were litigated at trial, the district court concluded that excessive force was used in

---

[5] We note that the expert testified that a Birmingham student has a ".004 percent" chance of being intentionally sprayed. We recognize, however, that the expert misspoke—he must have meant to say that there is a 0.4% chance, or four-tenths of one percent chance. The expert testified that there had been 70,676 total students between 2006 and 2014 of which 298 were intentionally sprayed. *See* D.E. 298 at 160–61. If you divide 298 by 70,676, the result is .004 or 4 out of 1000. It is not .004% or 4 out of 100,000.

only two of them:  one against K.B. and the other against B.J. (who was not a plaintiff for the class claims).  *See* D.E. 282 at 2, 4, 58.  Two students out of 70,676 would mean that there is only a .003%, or 3 out of 100,000, chance of being unconstitutionally sprayed.  Either way, those miniscule probabilities mean that the likelihood of future injury is far too speculative to support standing.

We do not suggest that Freeze +P will never be used against a student in an unconstitutional way by any SRO in the future, and we do not minimize the discomfort or pain (however temporary) suffered by students who are sprayed. The record, though, does not show that the probability of future instances of unconstitutional spraying is sufficient to provide standing to obtain declaratory and injunctive relief.  *See 31 Foster Children*, 329 F.3d at 1266 ("As *Lyons* illustrates, future injury that depends on either the random or unauthorized acts of a third party is too speculative to satisfy standing requirements.").

The district court concluded that standing for injunctive relief existed in part due to the involuntary nature of the students' position.  The court reasoned that the students were in the same position as the plaintiffs in *31 Foster Children* and *Church*, and the students echo that rationale on appeal.  *See* D.E. 282 at 86–94; Appellees' Br. at 36–38, 38 n.9.

We disagree.  The plaintiffs in *31 Foster Children* and *Church* could not avoid exposure to the conduct they challenged because their own behavior or

40

situation, which drove the challenged conduct, was involuntary. "[F]or reasons beyond [their] control" they were "unable to avoid repeating the conduct that led" to their injuries. *See Church*, 30 F.3d at 1338. In *31 Foster Children*, the plaintiffs were foster care children who were in the state's custody involuntarily and would be until they were adopted or reached the age of majority. *See* 329 F.3d at 1266. Because they were legally required to be in the state foster care system, the children could not "avoid exposure to the . . . challenged conduct," which consisted of "alleged systematic deficiencies" and the resulting harms. *See id.* The same type of involuntariness was present in *Church*, where we recognized that the plaintiffs' homelessness was an involuntary status and the City of Huntsville's alleged policy of harassment and arrest was incited by that homelessness. *See* 30 F.3d at 1338–39. The plaintiffs in those two cases could expect to be future victims of more of the same harms they had alleged because they faced those harms due to circumstances they could not change.

Although we recognize that school attendance in Alabama is mandatory, *see* Ala. Code § 16–28–3, and that Birmingham students attend schools where SROs are present, the students have not explained how they are likely to be unconstitutionally sprayed with Freeze +P simply because of their status as students, *cf. Lyons*, 461 U.S. at 108 ("[I]t is no more than conjecture to suggest that in every instance of a traffic stop, arrest, or other encounter between the police and

41

a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse."). Students may misbehave or act defiantly from time to time, but they can control their own behavior. *Cf. Lynch*, 744 F.2d at 1456–57 & 1457 n.7 (concluding that the plaintiff had standing because he suffered from an involuntary mental condition that made it likely that he would be incarcerated again and subjected to an allegedly unconstitutional policy). As a result, we conclude that K.B. did not have standing to bring her class claim for declaratory and injunctive relief as to the use-of-spray policy.

C.    Standing for the Decontamination Claim

K.B.'s class-based claim against Chief Roper also alleged that he violated the Fourth Amendment rights of K.B. and the class by promulgating unconstitutional decontamination policies. Although the district court focused its standing analysis primarily on K.B.'s spraying claim, we also address whether K.B. can seek class-based relief for her claim that Chief Roper's decontamination policies are unconstitutional.

Our holding that K.B. lacks standing under *Lyons* to pursue relief on the spraying claim compels the conclusion that she also lacks standing to pursue class-based relief on her decontamination claim. The probability that a student will be decontaminated (properly or improperly) hinges on the likelihood of being sprayed or exposed to the spray; if a student is not sprayed or otherwise exposed to the

42

spray, then there will be no need for decontamination. The record indicates that a total of 70,676 students were enrolled in the eight Birmingham high schools during the eight-year time span between 2006 and 2014. And out of those 70,676 students, 1,250 of them were exposed to the spray — intentionally or unintentionally — during that time period. Even if we assume that every one of those 1,250 students was improperly decontaminated — unlikely as that seems — there is still only a 1.77% chance (1,250 ÷ 70,676) that a given student would be exposed to spray and improperly decontaminated.

A 1.77% chance is not enough under *Lyons*. To state the same thing from a different direction, a 1.77% chance of being improperly decontaminated means there is a 98.23% chance of not being improperly decontaminated (because not sprayed at all).[6] In addition, the odds of being improperly decontaminated depend

_____

[6] The dissent notes that standing does not depend on the merits of K.B.'s claim, and that we must accept her contention that the decontamination measures are constitutionally inadequate. Dissenting Op. at 1. We agree and do accept her contention by assuming that the officers improperly decontaminated all of the 1,250 students who were sprayed or otherwise exposed to it. (We do not reach the issue of whether the officers' decontamination measures are constitutionally adequate because we have concluded that qualified immunity is proper on the ground that the law was not clearly established.)

The dissent also sees support for its position in the *Lyons* decision or some extraordinary variation of its facts, one in which every police officer applied a chokehold to every citizen the officer encountered, no matter what. Dissenting Op. at 2. But in the real world, the Supreme Court held that the plaintiff in *Lyons* lacked standing because police officers in Los Angeles did not chokehold every citizen they encountered and the city had no policy ordering or authorizing them to do so. *See Lyons*, 461 U.S. at 105–06 ("In order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose

43

not only on the acts of the misbehaving students that lead to the spraying, but on the intentional acts of the SROs (spraying students and then improperly decontaminating them). And because the 1.77% figure also encompasses students who are inadvertently exposed to the spray when an officer intentionally sprays another student, it also depends to some extent on the random act of being in the vicinity of a misbehaving student who is the target of the spraying. "As *Lyons* illustrates, future injury that depends on either the random or unauthorized acts of a third party is too speculative to satisfy standing requirements." *31 Foster Children*, 329 F.3d at 1266.

Our dissenting colleague contends that we are improperly framing the standing inquiry as a quantitative one rather than a qualitative one, and that if we properly framed it as qualitative one the 1.77% figure is somehow not unlikely enough to defeat K.B.'s standing argument. Dissenting Op. at 2–3. To support that position, the dissent quotes one sentence from our *Browning* opinion: "How likely is enough is necessarily a qualitative judgment . . . ." 522 F.3d at 1161. To begin with, *Browning* explained that a "qualitative judgment" focuses the standing inquiry on whether the future injury is "probabilistic in nature." *Id.* at 1162. And

---

of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner."). Likewise, in this case, the SROs did not pepper spray and improperly decontaminate every student they encountered, nor were they ordered or authorized to do so. Instead of supporting the dissent's position in this case, *Lyons* runs counter to it.

44

it illustrated what that meant by citing a case in which "there [was] every likelihood" and "it [was] highly likely" that the plaintiff would be injured in the future. *Id.* at 1162 (quoting *Lynch*, 744 F.2d at 1457). A 1.77% chance is not in "every likelihood" or "highly likely."[7]

The dissent admits that *Browning* is "not controlling because of its different facts," Dissenting Op. at 4, and a deeper dive into *Browning*'s standing analysis shows why. *Browning* involved a group of organizational plaintiffs which worked to increase voter registration for racial and ethnic minorities. 522 F.3d at 1158. The organizational plaintiffs challenged a state voter registration law, which required a person registering to vote for the first time in the state to disclose on the registration application her driver's license number or the last four digits of her social security number, and that number had to match up with the number for the voter contained in the state driver's license database or the Social Security Administration's database. *Id.* at 1155, 1158. We determined that the "odds that

---

[7] The dissent adds to its reliance on *Browning* a "see also" citation to a Ninth Circuit decision. *See Sample v. Johnson*, 771 F.2d 1335, 1343 (9th Cir. 1985). But the *Sample* decision actually contradicts the dissent's position, as the very language the dissent quotes from shows: "[B]ecause the conceptions of probability that have arisen in jurisprudence and in other branches of learning have far from achieved a perfect congruence, *we prefer to describe 'probability' qualitatively, as requiring a very significant possibility*, and not quantitatively, as mandating a 'greater than fifty percent' likelihood." *Id.* (emphasis added) (citation omitted). And the court used those terms in discussing whether the test for standing "should be one of more likely than not, *i.e.* in instances reducible to percentages . . . or whether the test should be one where probability, in the strict sense, is not required, but merely some significant possibility." *Id.* A 1.77% chance that a future injury will occur is not "a very significant possibility" or "some significant possibility," which is what the Ninth Circuit required in *Sample*. And using the label "qualitative" does not change that.

any given application [would] be rejected because of a mismatch" was one percent. *Id.* at 1163. In considering standing, we stated that the organizational plaintiffs had to show only that "*at least one member* face[d] a realistic danger of having his or her application rejected due to a mistaken mismatch" to establish standing *Id.* (emphasis added).

We concluded that the organizational plaintiffs in *Browning* had established standing because it was nearly certain that at least one member would have her voter registration application rejected because of an inevitable error in transcribing numbers. *Id.* ("Given that the [organizational plaintiffs] collectively claim around 20,000 members state-wide, it is highly unlikely — even with only a one percent chance of rejection for any given individual — that not a single member will have his or her application rejected due to a mismatch."). The dissent in this case highlights that one percent error rate to argue that standing exists in this case, Dissenting Op. at 4–6, but that figure does not tell the whole story. Applying that error rate in *Browning*, we hypothesized that if "200 individuals among the 20,000 members of the [organizational plaintiffs were] first-time registrants and thus subject to the [law's] matching requirement," then the probability of at least one member being rejected was 87%. *Id.* at 1163 n.13. (And using the two percent error rate applicable to Latinos and African-Americans, the "likelihood that at least one person . . . [would] fail to match increase[d] to over ninety-eight percent." *Id.*)

46

So the chance that at least one member of the organizations would be harmed was not one percent, but at least 87%. An 87% probability of injury unquestionably qualifies as "highly likely." *Id.* at 1162.

The core distinction is that *Browning* is an association or organization case, while this case is a class action. All that an association must do to establish the injury element of standing is show a realistic danger that at least one member of the association will suffer future injury unless relief is granted. *Id.* at 1163. By contrast, the Supreme Court has stated that whether a suit is a class action "adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured." *Spokeo, Inc. v. Robins*, 578 U.S. __, 136 S. Ct. 1540, 1547 n.6 (2016) (quotation marks omitted); *see also City of Hialeah v. Rojas*, 311 F.3d 1096, 1101 (11th Cir. 2002) ("This Court requires that a plaintiff who wishes to bring a lawsuit on behalf of a class of individuals . . . must . . . have standing to bring the claim. . . .") (quotation marks omitted).[8] And because K.B. sought injunctive relief, she was required to "allege[], and ultimately prove[], a real and immediate — as opposed to a merely conjectural or hypothetical — threat of *future* injury" to her. *Church*, 30 F.3d at

---

[8] As stated above, K.B. is no longer a student, but we still examine whether she, as the named plaintiff, had standing to represent the class. *See McLaughlin*, 500 U.S. at 51–52 (considering whether the named plaintiffs had standing based on the allegations in their complaint, even though their claims had since been rendered moot by the time of their appeal).

47

1337 (class action); *see also Lyons*, 461 U.S. at 102 (stating that a claim for injunctive relief requires the plaintiff to show that she is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the . . . threat of injury must be both real and immediate, not conjectural or hypothetical") (quotation marks omitted); *Lynch*, 744 F.2d at 1457 (concluding in a class action that the named plaintiff had standing where it was "highly likely" that he would suffer future injury). A 1.77% claim that K.B. would be sprayed and improperly decontaminated is closer to "highly unlikely" than to "highly likely."

Finally, insofar as *Browning*'s standing analysis is relevant to this case, *Browning* was guided by how the *Lyons* Court had relied on several factors to deny standing. 522 F.3d at 1162. First, it pointed out, "the [*Lyons*] Court noted that for the threatened injury to occur, a sequence of individually improbable events would have to occur:" (1) Lyons would have had to do something to cause another encounter with the police, (2) the city "would have had to have authorized all police officers to use choke holds unnecessarily," (3) the officers "in that specific encounter would have had to use a choke hold," and (4) "the use in that situation would have to have been unnecessary." *Id.* "Second, the threatened injury in *Lyons* was predicated on the plaintiff first doing something that at least would give an officer probable cause to detain or arrest him." *Id.* And third, "there was an

48

adequate remedy at law for the threatened injury in *Lyons*, namely a damages suit against the [c]ity and police." *Id.*

Those three factors support the denial of standing in this case. As for the first factor, the likelihood of improper decontamination depends on a similar "sequence of individually improbable events": (1) the students would have to do something to cause an encounter with the officers, (2) the officers must be authorized to decontaminate the students improperly, (3) the officers in that specific encounter would have to decontaminate the students improperly (we assume that this factor favors the students), and (4) the improper decontamination would have to be unnecessary. *See id.* at 1162 ("Each event's occurrence [in *Lyons*] was spatially and temporally indeterminate, as opposed to being fixed to either occur or not occur at some time and place. This open-endedness and the number of independent events needed to bring about the alleged injury combined to cast the injury into the realm of conjecture and speculation.").[9] About the second and third factors, as in *Lyons* the threatened injury here (improper

---

[9] In contrast, we explained in *Browning* that the injuries to the organizational plaintiffs were "foreseeable and the expected results of unconscious and largely unavoidable human errors in transcription" and that, "unlike in *Lyons*, the chain of events leading to the eventual injury does not begin with an assumption that someone will commit an illegal act; the chain begins when people try to register to vote." *Id.* at 1163–64. And we were careful to distinguish *Lyons* by stating that the "odds of an injury occurring in this case does not depend on conjecture about how individuals will intentionally act in the future." *Id.* at 1163 (quotation marks omitted). But in this case the odds of being improperly decontaminated do depend on the SROs' intentional acts and the students' intentional, unauthorized acts (as well as the acts or decisions of students that put them in the vicinity of a student who is intentionally sprayed).

49

decontamination) is based on a student behaving in a way that warrants spraying or on the chance of being in the vicinity of a student who does.  And if a student is unlawfully sprayed or unlawfully decontaminated (or both) then she may pursue a damages action against the city and the officer, as this case illustrates.[10]

From a quantitative and qualitative perspective, K.B. does not have standing to pursue her decontamination claim.  A 1.77% chance of being improperly decontaminated is not enough to establish standing.  That low likelihood reflects the qualitative fact that K.B.'s standing claim depends on open ended, independent, and unpredictable events that "cast the injury into the realm of conjecture and speculation."  *Id.*

## IV.    CONCLUSION

The district court's order of September 30, 2015, is final under our decision in *Alabama*, 828 F.2d at 1537–38, because it contained extensive findings of fact and conclusions of law concerning the alleged constitutional violations, and because it provided specific directions for the parties to follow in submitting a

---

[10] The dissent also relies on the Fourth Circuit's decision in *Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018), to support its argument that K.B.'s standing to pursue her decontamination claim does not depend on conjecture about how students and officers will act in the future.  That court held that students had standing to challenge on vagueness grounds a law which prohibited causing a disturbance in school and a disorderly conduct law.  *Id.* at 284.  But that decision relied partly on considerations unique to vagueness challenges (such as deprivation of notice and arbitrary enforcement) that are not present here.  *Id.* at 284, 288.

remedial plan for class-based injunctive relief. We therefore have jurisdiction to entertain the appeal.

The six SROs who were held individually liable on the students' § 1983 Fourth Amendment decontamination claims are entitled to qualified immunity, and we therefore reverse the judgments entered against them.

Because the named plaintiff for the class lacks standing under *Lyons*, 461 U.S. at 107–10, and *Kerr*, 875 F.2d at 1554–55, to seek declaratory and injunctive relief for the spraying claim, and also lacks standing under *Lyons* to pursue injunctive relief for the decontamination claim, we reverse in full the district court's order providing equitable relief and requiring the parties to take any action.

**REVERSED**.

51

JORDAN, Circuit Judge, concurring in part and dissenting in part.

With one exception, I concur in and join the majority's opinion. My disagreement concerns the plaintiffs' standing to pursue class-based injunctive relief on the claim that the decontamination protocol of the Birmingham Police Department is unconstitutional. As I see things, there is a substantial likelihood that students in Birmingham high schools will—assuming the validity of the plaintiffs' claim—be improperly decontaminated in the future, and I would hold that the plaintiffs have standing to seek an injunction.

For purposes of standing, we must accept the plaintiffs' claim that the Constitution requires SROs to decontaminate all students exposed to chemical spray by providing access to water, ventilation, and a clean change of clothes—and that SROs were not and are not doing all of these things due to the BPD's unconstitutional decontamination protocol. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("Standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal[.]"). In contrast to the spraying claim, the adequacy of the decontamination protocol is not dependent on the constitutional validity of the use of Freeze +P in the first instance.

I generally agree with the majority that the likelihood that a student will need to be decontaminated hinges on the likelihood of being sprayed or being exposed secondarily to spray. We know, however, that students will continue to

52

encounter SROs at school.  *See, e.g.,* D.E. 299 at 186 (discussing the number of SROs stationed at Birmingham high schools).  And we also know that SROs will continue to use Freeze +P on students, which means that SROs will necessarily have to engage in decontamination efforts that will presumably be dictated by the BPD's protocol.  It is therefore inevitable that, absent an injunction, SROs will continue to decontaminate students in an allegedly unconstitutional manner.  The inadequate and allegedly unconstitutional decontamination protocol is akin to an unconstitutional policy that requires police officers to apply a chokehold to all citizens that they encounter.  *Cf. City of Los Angeles v. Lyons*, 461 U.S 95, 105–06 (1983) ("To establish an actual controversy in this case, Lyons would have had . . . to allege (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they encounter . . . or (2) that the city ordered or authorized police officers to act in such a manner.").

The majority holds that a 1.77% likelihood of being sprayed (and of having to be decontaminated) is insufficient as a matter of law to satisfy *Lyons*, 461 U.S at 108.  I am not convinced.  Although tempting, it is unsound to reduce the "substantial likelihood" requirement for seeking injunctive relief to a purely quantitative (i.e., mathematical) analysis.  Indeed, we have held that standing exists to prevent probabilistic injuries so long as those injuries are substantially likely to come to pass, and have framed the inquiry as qualitative: "How likely is enough [to

satisfy the substantial likelihood of future injury requirement] is necessarily a qualitative judgment[.]" *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1162 (11th Cir. 2008). *See also Sample v. Johnson*, 771 F.2d 1335, 1343 (9th Cir. 1985) ("[B]ecause the conceptions of probability that have arisen in jurisprudence and in other branches of learning have far from achieved a perfect congruence, we prefer to describe 'probability' qualitatively, as requiring a very significant possibility, and not quantitatively, as mandating a 'greater than fifty percent' likelihood.") (internal citation omitted).

Using the statistics presented at trial, on average about 138 Birmingham high school students have been sprayed or exposed to spray every year from 2006-2014—some without having done anything wrong—and have therefore been subject to allegedly unconstitutional decontamination efforts due to the BPD's protocol. *See* D.E. 298 at 164, 168. "Past behavior is the best predictor of future behavior," *Cordova v. Aragon*, 569 F.3d 1183, 1205 (10th Cir. 2009) (O'Brien, J., concurring in part and dissenting in part), and those yearly instances of injury over an eight-year period constitute a fair predictor of future harm. After all, "what's past is prologue." William Shakespeare, The Tempest, act 2, sc. 1 (1611). *Cf. Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (holding that Latino plaintiffs had standing to pursue class-based injunctive relief on their claim that the defendants had a practice, based on racial profiling, of detaining persons on

54

suspicion of being unlawfully in the United: "[A]lthough . . . the likelihood of a future stop of a particular individual plaintiff may not be 'high,' we are not convinced that the district court erred in determining that future injury was nevertheless 'sufficiently likely,' given the defendants' stated policy and practice.").

Though not controlling because of its different facts, our decision in *Browning* is informative. In that case, organizations representing minority interests challenged a Florida voter registration statute which required each applicant to disclose specific identifying information that was then verified with information maintained by the state. 522 F.3d at 1156. If the information provided did not match, the applicant would not be registered to vote unless certain corrective measures were timely taken. The organizations alleged that the voter registration procedure left applicants with too little time to fix the matching error before voter rolls closed in advance of an upcoming election, and sued to enjoin enforcement of the statute. *Id.* at 1157.

With respect to the standing of the organizations, we first explained that "there is no per se rule denying standing to prevent probabilistic injuries." *Id.* at 1162. Then, recognizing that there was a mere one-percent chance that any given applicant would be rejected due to mismatched information, *id.* at 1163, we affirmed the district court's ruling that the organizations had standing to seek

injunctive relief, even though they had not identified any specific applicants whose registrations were rejected. "Given that the NAACP and SVREP collectively claim around 20,000 members state-wide, it is highly unlikely—even with only a one percent chance of rejection for any given individual—that not a single member will have his or her application rejected due to a mismatch." *Id.* We distinguished the insufficient threat of future injury in *Lyons* because the odds of an injury occurring due to the registration statute did not depend on conjecture about how individuals would intentionally act in the future. "[T]he injuries are foreseeable and the expected results of unconscious and largely unavoidable human errors in transcription." *Id.* at 1163. In addition, the chain of events "leading to the eventual injury" did "not begin with an assumption that someone will commit an illegal act." *Id.* at 1164.

The same, I submit, is true here. As explained above, the decontamination claim does not depend on conjecture about how students or SROs will intentionally act in the future. SROs can constitutionally use Freeze +P on students under certain circumstances, but not all of their deployments of spray have been appropriate. *See* D.E. 282 at 52 ("[T]he court concludes that there was simply no reason for Officer Smith to spray K.B. with Freeze +P. . . . No justifiable basis existed for Officer Benson to spray B.J. with Freeze +P."). But regardless of how a student has behaved, or whether an SRO has properly chosen to spray a student,

decontamination of some kind will be necessary after Freeze +P is used, and SROs will resort to and follow the BPD's allegedly unconstitutional protocol. *Cf. Lyons*, 461 U.S. at 106 (explaining that a plaintiff could seek an injunction against police misconduct where the government "ordered or authorized police officers" to enforce an unconstitutional policy); *Kenny v. Wilson*, 885 F.3d 280, 290 (4th Cir. 2018) (rejecting argument that students lacked standing under *Lyons* to challenge "disturbing schools" and "disorderly conduct" laws in part because they alleged "that there will be future encounters with officers at school and that the statutes in question authorize defendants to violate their rights to due process and free speech").

In my view, there is a substantial likelihood that, absent an injunction, SROs will continue to decontaminate Birmingham high school students in an allegedly unconstitutional manner. I would therefore hold that the plaintiffs have standing to pursue class-based injunctive relief with respect to their decontamination claim.